**MINNEAPOLIS POLICE DEPARTMENT,**
Relator,

v.

**Phillip KELLY, Respondent,**

**City of Minneapolis, Commission on Civil Rights, Respondent.**

No. A09–81.

Court of Appeals of Minnesota.

Jan. 12, 2010.

Susan L. Segal, Minneapolis City Attorney, Timothy S. Skarda, Assistant City Attorney, Minneapolis, MN, for relator.

William L. Walker, Walker Law Offices, P.A., Minneapolis, MN, for respondent, Kelly.

Considered and decided by MINGE, Presiding Judge; SCHELLHAS, Judge; and HARTEN, Judge.

## OPINION

MINGE, Judge.

By writ of certiorari, relator Minneapolis Police Department (MPD) seeks reversal of the decision by the Minneapolis Commission on Civil Rights (the commission) that MPD officers unfairly discriminated against respondent. We affirm.

## FACTS

About noon on January 8, 2004, respondent Phillip Kelly, a middle-aged, African–American resident of Minneapolis, was walking to a convenience store to purchase bread and cigarettes. A Minneapolis park police officer driving in the area heard a dispatch reporting an armed robbery at a nearby business. The robber was described as an African–American male wearing a black jacket and jeans. Kelly was wearing blue jeans, and his jacket and hood were black.

Suspecting that Kelly might be the reported robber, the park officer radioed for backup, approached Kelly from behind, and told him to stop. Kelly did not see the officer and, because he was listening to a portable music device with headphones, did not hear the command to stop. The

park officer grabbed Kelly from behind, placed a handcuff on one of his wrists, and wrestled him to the ground. Surprised and not knowing why he had been taken down, Kelly resisted. MPD officers Villamor and Dubay arrived to assist the park officer. Not knowing why he was seized, Kelly continued to resist being handcuffed and refused to enter the squad car. To force Kelly into the squad car, officer Villamor applied pain-compliance holds and knee strikes. The officers testified that Kelly appealed to bystanders for help in what he perceived to be a baseless, racist seizure. Once in the squad car, Kelly remained angry and the officers testified that they could not communicate with him.

The MPD officers brought Kelly to the store that was robbed. Once there, Kelly calmed down and asked why he was being stopped. The officers arranged for the store employees to view Kelly. The employees said Kelly was not the robber and Kelly asked to be released. The MPD officers informed Kelly that he was under arrest for his pre-show-up conduct and brought him to the Hennepin County jail, charging him with the misdemeanors of disorderly conduct, Minneapolis, Minn., Code of Ordinances § 385.90 (2004), and obstruction of legal process, Minn.Stat. § 609.50 (2004).

Minnesota Rules of Criminal Procedure provide that, rather than arresting and detaining a misdemeanor offender, officers are to give citations unless:

it reasonably appears to the officer that arrest or detention is necessary to pre-

vent bodily harm to the accused or another or further criminal conduct, or that there is a substantial likelihood that the accused will fail to respond to a citation. The citation may be issued in lieu of an arrest, or if an arrest has been made, in lieu of continued detention.

Minn. R.Crim. P. 6.01, subd. 1(1)(a) (2008). The record contains a form completed by the officers with boxes checked indicating that Kelly was detained because of the risk that he would commit further crimes and would not respond to a citation. Kelly was jailed at 1:23 p.m. and released from jail at about 6:30 p.m. The charges against Kelly were ultimately dropped.

Based on these events, Kelly filed a complaint against the MPD with the Minneapolis Department of Civil Rights.[1] He claimed he was assaulted and wrongfully jailed, and that race wrongfully played a role in those actions. An investigator concluded that there was probable cause that racial discrimination had occurred and referred the complaint to the commission.

The commission established a panel of three members to consider the matter. *See* Minneapolis, Minn., Code of Ordinances § 141.50(i) (2008) (hereinafter multiple provisions of the 2008 Code of Ordinances apply to this case and are referred to as "Ordinance"). A hearing was held that followed a jury-trial format with two commissioners acting as jurors and the third commissioner as the presiding officer. Based on the hearing, the panel in a special verdict concluded: (1) the officers did not use excessive force when they ap-

---

**1.** The Minneapolis Department of Civil Rights provides administrative services for the commission. Minneapolis, Minn., Code of Ordinances § 141.80(b) (2008). The department, among other duties, receives complaints, investigates claims for probable cause, conciliates disputes, and refers cases to the commission. *Id.* § 141.80(c); 141.50. The commission consists of members ap-

pointed under different rules than the department, and is charged with rule-, policy- and decision-making authority regarding the civil-rights ordinance. *Id.* § 141.40. Following the department's investigation and referral, the commission conducts hearings and renders findings pursuant to the ordinance. *Id.* § 141.50.

prehended Kelly and took him to the show-up; (2) the MPD unreasonably detained Kelly after he was cleared of the robbery; and (3) "race was a discernible, discriminatory and causative factor in [Kelly's] adverse treatment." The special-verdict determination awarded Kelly $5,000 for mental suffering, $382.50 in actual damages, and $8,500 in punitive damages, and ordered payment of an additional $8,500 in civil penalties to the City of Minneapolis. The chair of the panel, on behalf of the commission, also issued findings of fact, conclusions of law, and an order for judgment with an accompanying memorandum. The MPD brings this certiorari appeal.

## ISSUES

1. Was the commission's determination that the MPD unfairly discriminated against Kelly unsupported by substantial evidence or arbitrary and capricious?

2. Was the commission's award of emotional and punitive damages to Kelly and the civil penalty to the city of Minneapolis unsupported by the record and improperly applied?

## ANALYSIS

### I.

The first issue is essentially whether the record adequately supports the discrimination decision by the commission. The commission is established by city ordinance. Ordinance § 141.10. The Minneapolis ordinance provides that the commission conducts hearings on complaints of discrimination in panels consisting of three commissioners pursuant to the Minnesota

2. If we were reviewing a jury verdict, we would only determine "whether the special-verdict answers can be reconciled in any reasonable manner consistent with the evidence and its fair inferences. If the answers to special verdict questions can be reconciled on

Administrative Procedure Act (APA) and that judicial review is also as governed by the APA. Ordinance §§ 141.50(i), (k), .60(b).

### A. Scope and Standard of Review

■ In reviewing the hybrid jury-trial/administrative-hearing format used in this proceeding, several documents comprise the determination under scrutiny. These are the commission's findings of fact, conclusions of law, and order for judgment; the accompanying memorandum signed by the presiding commissioner; and the panel's special verdict based on jury instructions presented to the panel. Although the commission utilized a process akin to a jury trial,[2] we recognize, as directed by the ordinance, that review is guided by the APA.

■ An agency decision is presumed correct and is not reversed unless one of several statutory bases is met. *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 562 (Minn.App.2001), *review denied* (Minn. Nov. 13, 2001). In relevant part, we only reverse agency action when the "finding, inferences, conclusion, or decisions are ... unsupported by substantial evidence in view of the entire record as submitted; or ... arbitrary or capricious." Minn.Stat. § 14.69 (2008). "Substantial evidence" is such evidence "that a reasonable mind might accept as adequate to support a conclusion. It must be more than a scintilla, some, or any evidence." *In re Am. Iron & Supply Co.'s Proposed Metal Shredding Facility*, 604 N.W.2d 140, 149 (Minn.App.2000) (quotation omitted).

*any* theory, the verdict will not be disturbed." *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 555 (Minn.2008) (quotations omitted). This standard is not as exacting as the APA's judicial-review guidelines.

An agency decision is arbitrary and capricious if it "represents the agency's will rather than its judgment." *In re Max Schwartzman & Sons, Inc.,* 670 N.W.2d 746, 753 (Minn.App.2003). Generally, we affirm an agency if, "in light of the entire record, the decision is supported by evidence a reasonable mind would accept as adequate." *Shockency v. Jefferson Lines,* 439 N.W.2d 715, 718 (Minn.1989). We defer to agency credibility determinations, "lest [we] substitute [our] judgment for that of the agency." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 277–78 (Minn. 2001).

█ In our role as a court reviewing agency action, we also consider whether the decision reviewed involves any question of agency expertise, and we defer to determinations that involve such expertise. *In re Excess Surplus Status,* 624 N.W.2d at 278. Here, the Minneapolis ordinance requires that the members of the commission "be persons known to favor the principles of equal opportunity, nondiscrimination, and the objectives of" the ordinance. Ordinance § 141.20(a). Such objectives include that of "protect[ing] all persons from discrimination and *from unfounded charges of discriminatory practices.*" Ordinance § 139.10(b)(4) (emphasis added). We acknowledge that the identification of discriminatory conduct is a challenging and delicate task, and we recognize that the intent of the ordinance is to establish a commission with expertise in making such findings.

### B. Establishing Unfair Discrimination

█ The ordinance prohibits "any person engaged in the provision of public services" from racially "discriminat[ing] against any person, in the access to, admission to, full use of or benefit from any public service." Ordinance § 139.40(j)(1). The test for determining unfair discrimination under this public-services provision is set forth in *Richardson,* 307 Minn. at 86–87, 239 N.W.2d at 201–02. To establish a prima facie case of such discrimination, *Richardson* requires that the claimant must introduce evidence showing that (1) the claimant is a member of a protected class; (2) the claimant was subjected to adverse and unreasonable treatment; and (3) the treatment was caused by a discriminatory consideration of race. *Id.* at 86–87, 239 N.W.2d at 202. Once discrimination is established, the accused may assert a nondiscriminatory reason for the conduct, which the claimant has the burden to disprove as pretextual. *Id.* at 87, 239 N.W.2d at 202.[3]

█ *Richardson* states that discrimination, the third element of a prima facie case, may be established either by direct or indirect evidence. *Id.* at 86–87, 239 N.W.2d at 202. Direct evidence consists of obvious, objective statements of a discriminatory motive resulting in the adverse action. Indirect or circumstantial evidence can consist of (1) proof of a difference in treatment with individuals similarly situated who are of a different racial origin than the complainant; or (2) proof

---

**3.** The *Richardson* standard applies a framework that parallels the burden-shifting standard in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Kelly argues that *McDonnell Douglas* is only suited to employment-discrimination claims, but does not elaborate on why a different framework should apply. Although *McDonnell Douglas* is not discussed in previ-

ous public-service-discrimination cases, *see Richardson,* 307 Minn. at 87, 239 N.W.2d at 202, *McDonnell Douglas* is so prominent in our state discrimination jurisprudence that it was not error for the commission to have approached the issue under a combined scheme of *McDonnell Douglas* and *Richardson.*

that the treatment of the complainant was so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation. *Id.; Beaulieu*, 518 N.W.2d at 571. Findings regarding wrongful discrimination turn heavily on credibility determinations and are upheld by the reviewing court if the evidence is conflicting or permits more than one reasonable inference to be drawn. *Richardson*, 307 Minn. at 88, 239 N.W.2d at 202.

The commission found that Kelly is a member of a protected class because of his race, he was subjected to adverse action by the MPD, and race was a discernable factor under the so-at-variance test. It is undisputed that Kelly is a member of a protected class and that his seizure, arrest, and jailing constituted adverse treatment. Because Kelly does not claim direct evidence of discrimination, the issue is whether there is indirect and circumstantial evidence that provides an adequate basis for the commission's finding that the MPD's conduct was so at variance with reasonable expectations that the commission could reasonably conclude that unfair discrimination was the probable explanation.

In *Richardson*, the supreme court formulated the standard for interpreting the public-services provision in upholding a state agency's finding of racial discrimination. *Id.* at 87, 239 N.W.2d at 202. There, police officers released dogs to attack an African–American youth witnessing an arrest, dragged him to a squad car, and used racial epithets as they brought him to the station. *Id.* at 82–83, 239 N.W.2d at 200. Because the racial epithets were direct evidence of discrimination, *Richardson* did not need to actually apply the indirect-evidence portion of the standard it articulated. *Id.* at 88, 239 N.W.2d at 203.

The decision in *Beaulieu* was based on indirect evidence.[4] 518 N.W.2d at 572–73. There, a robbery was reported to have been committed by an African–American male. *Id.* at 568. Police patrolling the area, aware of the crime and the description of the robber, saw an African–American person of unknown gender driving with an African–American male passenger, stopped the vehicle, learned the driver was female and the male was her 13–year–old son, and detained the mother and son for 15 minutes. *Id.* at 568–69. There was no evidence of racial comments. Based on indirect evidence, the supreme court concluded that a reasonable factfinder could infer wrongful discrimination because the police had no reason to believe that the suspect was 13 years old or had a female accomplice and because the claimant wore different clothing than the suspect. *Id.* at 573. The supreme court also noted that the officers lied to the claimants in stating that a car was involved with the robbery, evidencing bad faith. *Id.* Therefore, evidence of an unjustifiable detention could allow a finding of discrimination under the *Richardson* standard. Given these circumstances, the supreme court remanded to the administrative law judge to determine whether the officers' conduct was "so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation." *Id.* at 573. Although the supreme court noted evidence of bad faith, the court did not indicate that a finding of bad faith was necessary for a discrimination determination. *Id.*

▮ In sum, our state's caselaw does not require that discrimination be established by direct evidence of racism. In *Beaulieu*, there was no allegation of racial

---

4. As a separate issue, the *Beaulieu* court considered the limits on immunity available to

police officers sued under the public-services provision. 518 N.W.2d at 571.

epithets or other indicia of discrimination. 518 N.W.2d at 568–70. The very purpose of the so-at-variance standard is to address less blatant acts of wrongful discrimination by allowing a fact finder to examine misconduct and weigh the circumstances to determine underlying motives by indirect evidence.

## C. Application of So–At–Variance Test

██ Here, there is no direct evidence of unfair discrimination and the commission used the so-at-variance test set forth in *Richardson*. The commission's decision was based on its determination that Kelly was jailed "in clear violation of the criminal rule which mandates the issuance of [a] citation for misdemeanor offenses." Its conclusion was that the "continued detention after the 'show up' was ... so at variance with what would reasonably be anticipated absent discrimination, that discrimination is the probable explanation." The commission further concluded that the officers' nondiscriminatory reasons for their decision to detain Kelly was pretextual. Documents in the record indicate that initially the reasons given were the risk that Kelly would commit further crimes[5] and that he would not respond to a citation.

As previously recognized, our task as a reviewing court is not to determine what we would decide if we were acting as the commission. Rather, we are to determine whether there is substantial evidence to support the commission's conclusion that the MPD's conduct was so at variance with reasonable expectations that discrimination is the probable explanation.

██ A key component of the commission's determination is the Minnesota rule for when to detain and jail and when to issue a citation. That rule holds that officers are to give citations for misdemeanor charges unless "it reasonably appears to the officer that ... there is a substantial likelihood that the accused will fail to respond to a citation." Minn. R.Crim. P. 6.01. This portion of the rule was adopted in 1975 when there was a national effort to prevent the discriminatory use of arrests for minor offenses. *See ABA Standards of Criminal Justice* §§ 10–2.2 cmt., 10–2.3 cmt. (2d ed. 1980) ("A standard that permits officers to arrest or not according to their personal assessment of a defendant inevitably is bound to lead to unequal enforcement of the laws.") (citing Kenneth Davis, *Discretionary Justice* 80–96 (1971)). The rule and its comments recognize that arrest is justified if there is a substantial likelihood that the defendant will fail to appear in court in response to a citation. Minn. R.Crim. P. 6.01 cmt. The comments make clear that the defendant's attachment to the community and prior history of response to the criminal process are relevant guideposts for such a determination. *Id.* This rule has become well established in law enforcement. *See State v. Askerooth*, 681 N.W.2d 353, 372–75 (Minn. 2004) (Russell Anderson, J., concurring) (noting that since 1975, rule 6.01 has "been workable and easily applied by officers on the street"). This court has consistently upheld enforcement of the limitation by the district court. *See State v. Martin*, 253 N.W.2d 404, 405–06 (Minn.1977) (finding arrest unjustified under rule 6.01); *State v. Richmond*, 602 N.W.2d 647, 653 (Minn.App.1999) (same), *review denied* (Minn. June 18, 2000); *State v. Evans*, 373 N.W.2d 836, 838 (Minn.App.1985); *see also In re Welfare of T.L.S.*, 713 N.W.2d 877, 881–82 (Minn.App.2006) (upholding arrest

---

**5.** As discussed subsequently, the MPD does not now press any claim that arrest and detention was required to prevent further crimes and we do not at this point further consider this basis for arrest and detention.

of expelled student who remained uncontrollable in officer's presence).

The arguments made to this court in *Richmond* about the use of a citation ring similar to those before us here. 602 N.W.2d at 653. There, the district court excluded evidence discovered following an arrest for careless driving and obstructing legal process because there was no basis for an arrest. *Id.* at 652–53. The police testified that early in the encounter the offender was not cooperative. *Id.* at 653. But the district court found that ultimately the offender was "under control" and that when the decision to arrest was made, there was no credible evidence that he would not respond to a citation. *Id.* The fact finder was not persuaded by officer testimony. *Id.* We affirmed, "[t]aking into account the discretion due district courts on credibility assessment of oral testimony." *Id.*

Here, as in *Richmond,* the officers claimed that they jailed Kelly because they believed that Kelly would fail to respond to a citation, citing his earlier behavior in the encounter when he had been angry and resistant. The commission, based on its review of the record and credibility of witnesses, determined that there was no valid or legal reason to arrest and detain Kelly. The record provides the following evidence that supports the commission's finding: by the time the officers jailed Kelly, it was clear that Kelly (1) was middle aged; (2) lived with his wife in the area; (3) had been peacefully walking to the store to purchase bread and cigarettes; (4) was listening to music on headphones and could not hear someone behind him; (5) was startled when taken down by an officer from behind; (6) was innocent of any robbery; (7) was embittered by this forcible seizure of his person and by being forced to lie on the pavement in January; (8) perceived that he was the victim of a racially motivated attack; (9) did not know during the initial struggle that he fit the description of a person who had just committed an armed robbery in the area; and (10) calmed down and was compliant once he learned the reason for his seizure.

The evidence is sufficient to allow the commission panel to infer, as a quasi-jury, that the officers: (1) knew or should have known all of the preceding evidence regarding Kelly; (2) decided to jail him because of his indignation following the initial seizure; (3) exacerbated the skirmish by jailing Kelly; (4) were well familiar with the citation directive in rule 6.01; (5) knew or should have known the purpose of rule 6.01 and that citation rather than arrest and jail is appropriate if the offender is attached to the community; (6) never offered Kelly a citation, attempted to determine his willingness to accept a citation, or checked his record for warrants or criminal history; and (7) could be presumed to know the racially charged atmosphere for policing in the African–American community based on their training. Finally, the record shows that the Hennepin County Detention Center released Kelly at about 6:30 p.m. and the City of Minneapolis dropped the charges without a hearing. Based on this record, we cannot conclude that the commission's findings—namely, that the MPD's conduct was willfully indifferent and the product of unfair discrimination under *Richardson* and *Beaulieu*—were arbitrary and capricious or unsupported by substantial evidence.

In reviewing the commission's action in this proceeding, we are not unmindful of two weighty considerations: (1) the need for law enforcement to make street-level arrest-detention decisions with broad discretion free from hyper-technical, after-the-fact discrimination review; and (2) the importance of identifying and addressing improper conduct in law enforcement and

the difficulty of determining the existence of racial discrimination—discrimination that is corrosive to the maintenance of a civilized society. The City of Minneapolis has established the commission to balance these considerations. Here, the commission faced that task in a situation involving the jailing of a person who, up to the point of the encounter with police, was law abiding and had simply been walking down the street to buy bread and cigarettes. The question is not what this appellate court would do as a trier of fact, but whether there was substantial evidence in the record from which the commission could determine that Kelly's detention was so-at-variance with proper standards that discrimination was the probable explanation.

### D. Pretext

■ The MPD responds that the officers made their decision to arrest and detain Kelly on the reasonable belief that there was a substantial likelihood that he would not appear in response to a citation because he was angry. This explanation shifted the burden to Kelly to establish that the nondiscriminatory reason was pretextual. While the commission, as fact finder, could have accepted the officers' nondiscriminatory reason, the commission found that reason pretextual because even the officers admitted that Kelly calmed down before he was given the citation. The officers argued that their experience with no-shows justified their reasonable decision to jail Kelly rather than give him a citation. This is a credibility question. Although the officers had several years of service on the MPD, nothing in the record establishes whether the officers had any actual expertise concerning no-shows or the frequency and circumstances of misdemeanor jailings. Nor was there any evidence, such as lack of attachment to the community or prior history of not responding to criminal process, that would

indicate that Kelly was not likely to appear in response to a citation. Based on this record, we conclude that there is not a sufficient basis for us to decide that the commission's disregard of the officers' explanation was arbitrary and capricious.

We also note that the police officers actually gave two reasons for their conduct: that Kelly would ignore the citation and that he was likely to commit "continued criminal activity." The second rationale regarding Kelly's potential to commit further crimes is not supported by *any* evidence in the record. Nor was it argued on appeal as a permissible explanation by relator. In reaching its conclusion of discriminatory treatment, the commission may have considered this abandoned alternative basis for detention of Kelly as supporting the finding that the arrest was conducted for discriminatory reasons.

Finally, we note that the commission did not find improper discrimination in the officers' seizing and subduing Kelly. It only found the decision to arrest and jail Kelly unreasonable and discriminatory under *Richardson* and *Beaulieu*. This decision by the commission, together with its detailed special verdict after instructions and its extensive findings, conclusions, order, and memorandum, all indicate that the commission carefully and evenhandedly evaluated Kelly's complaint and the officers' actions, and endeavored to reach a proper determination.

In sum, we conclude that there was adequate indirect evidence in the record to provide substantial evidence supporting the commission's determination of racial discrimination in the continued arrest and jailing of Kelly by the MPD.

### II.

■ The second issue on appeal is whether the damages are supported by the

record. The MPD argues that, even if the finding of racial discrimination is warranted, the assessed damages were unsupported by the evidence. Kelly argues that the award should be greater. However, because Kelly did not file a notice of review pursuant to Minn. R. Civ.App. P. 106, the issue is not preserved for appeal and we decline to address it. *See In re Cont'l Tel. Co.*, 358 N.W.2d 400, 404 (Minn.App.1984) (on writ of certiorari, respondent may properly raise additional issues by filing notice of review), *aff'd in part, rev'd in part,* 389 N.W.2d 910 (Minn.1986).

■ The damages section of the Minneapolis ordinance provides:

The hearing committee shall order any respondent found to be in violation of any provision of section 139.40 to pay a civil penalty to the City of Minneapolis. This penalty is in addition to compensatory and punitive damages to be paid to an aggrieved party. The hearing committee shall determine the amount of the civil penalty to be paid, taking into account the seriousness and extent of the violation, the public harm occasioned by the violation, whether the violation was intentional, the cost of investigation incurred by the City of Minneapolis, and the financial resources of the respondent. Any penalties imposed under this provision shall be paid into the general fund of the city. In all cases, the hearing committee may order the respondent to pay an aggrieved party, who has suffered discrimination, compensatory damages in an amount up to three (3) times the actual damages sustained. In all cases, the hearing committee may also order the respondent to pay an aggrieved party, who has suffered discrimination, damages for mental anguish or suffering and reasonable attorneys fees in addition to punitive damages in an amount not more than eight thousand

five hundred dollars ($8,500.00). Punitive damages shall be awarded pursuant to Minnesota Statutes Section 549.20. In any case where a political subdivision is a respondent, the total punitive damages awarded an aggrieved party may not exceed eight thousand dollars five hundred ($8,500.00)....

Ordinance § 141.50(m). Findings of damage awards made under anti-discrimination statutes receive considerable deference. *See Kohn v. City of Mpls. Fire Dept.*, 583 N.W.2d 7, 14 (Minn.App.1998) (giving deference to district court's damage award based on mental anguish caused by discrimination), *review denied* (Minn. October 20, 1998).

The commission panel completed a special-verdict form setting damages. Those damages were explained in an accompanying memorandum authored by the commissioner who served as the presiding officer of the panel. Following the categories identified in the ordinance, the commission imposed: (1) a civil penalty of $8,500 to the Minneapolis general fund; (2) $382.50 to Kelly in compensatory damages; (3) $5,000 to Kelly in mental-anguish damages; and (4) $8,500 to Kelly in punitive damages.

*A. Mental Anguish*

■ With respect to the $5,000 award for mental anguish, the MPD argues that there is no evidence of mental injury. In civil-rights cases, expert evidence of psychological damage and "specific proof of out-of-pocket losses are unnecessary" to establish emotional-distress damages. *Navarre v. S. Wash. County Schs.*, 633 N.W.2d 40, 55 (Minn.App.2001) (discussing damages for emotional distress in the context of discrimination claims and allowing an emotional-damages claim supported by evidence that "was conclusory and not substantiated by any medical testimony ... to be submitted to the jury"),

*aff'd in part, rev'd in part*, 652 N.W.2d 9, 29–30 (Minn.2002). The claimant need only "offer evidence of the nature and extent of emotional harm caused by an alleged violation." *Id.* Here, Kelly described the emotional anguish caused by the MPD's alleged discrimination. He testified that he felt powerless and that he "had no rights." His testimony established humiliation and distress suffered incident to his wrongful arrest and jailing. Because this testimony is sufficient to establish mental anguish, we conclude that the commission did not abuse its discretion in awarding Kelly $5,000 damages for mental anguish.

### B. Civil Penalty and Punitive Damages

■ The MPD also challenges the civil penalty payable to the City of Minneapolis and punitive-damage award. Because these two types of damage are interrelated, we consider them together.

The ordinance specifies that punitive damages must comply with Minn.Stat. § 549.20, subd. 1(a) (2008). Ordinance § 141.50(m). Under that section, punitive damages are awarded when the offender acts with "deliberate disregard for the rights or safety of others." Minn.Stat. § 549.20, subd. 1(a). The civil penalty is determined based on "the seriousness and extent of the violation, the public harm occasioned by the violation, whether the violation was intentional, the cost of investigation incurred by the City of Minneapolis, and the financial resources of the respondent." Ordinance § 141.50(m). The MPD argues that (1) the factors for awarding punitive damages were not explicitly considered; (2) the civil-penalty analysis overlapped with the punitive-damage analysis; and (3) because the MPD is part of the City of Minneapolis, the MPD is paying the award to itself and civil damages are moot.

■ The commission can award punitive damages for discrimination based on the "willful indifference" standards set forth in Minn.Stat. § 549.20. *See Huygen v. Plums Enters. of St. Paul, Inc.*, 355 N.W.2d 149, 156 (Minn.App.1984) (invalidating a punitive damages award by a city's human-rights commission because the standard used by the commission is inconsistent with the state willful-indifference standard embodied in Minn.Stat. § 549.20 (1982)). In *Bougie v. Sibley Manor, Inc.*, we reversed the district court for not considering the factors in section 549.20. 504 N.W.2d 493, 499–500 (Minn. App.1993).

Here, unlike in *Bougie*, the commission panel awarded punitive damages as a part of the special-verdict award in response to jury instructions that set forth the requisite statutory factors, finding that "by clear and convincing evidence," the MPD "acted with deliberate disregard for the rights of [Kelly]." We note that this finding is essentially a function of the commission's determination that the MPD wrongfully jailed Kelly based on his race. Furthermore, the presiding officer of the commission panel identified the required statutory analysis in her findings and memorandum of law. Because this explanation demonstrated application of section 549.20 and was supported by the commission's prior findings, we conclude the commission did not err in awarding the punitive damages.

■ The ordinance provision for the civil penalty applies on grounds similar to the punitive-damage award. *Compare* Ordinance § 141.50(m) *with* Minn.Stat. § 549.20. The MPD does not provide any legal basis for its argument that these two penalties, similar in their application, cannot be concurrently assessed on similar bases. In assessing the civil penalty, the commission's special verdict found the ac-

tions by the MPD constituted "a serious violation which causes significant public harm by the erosion of public trust by citizens of color." The commission concluded that the harm was intentional, serious, and detrimental to the public—all factors cited by the ordinance. The record indicates that substantial time of city employees was spent by the Minneapolis Department of Civil Rights in investigating and processing Kelly's complaint. The MPD has not demonstrated that the $8,500 award is excessive or unsupported by substantial evidence.

██ The MPD complains that an award of damages against the MPD for the Minneapolis general fund is unusual. It is well established, however, that "[e]very law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (2008); *see also* Minn.Stat. § 645.17(2) (2008) (establishing presumption that legislature intends entire statute to be "effective and certain"). The ordinance plainly allows for civil penalties against all possible defendants, including public entities, and it explicitly addresses situations where the defendant is a "political subdivision" of the city. Ordinance § 141.50(m). This court does not disregard a legislative body's decision if it is unambiguous. *State by Beaulieu v. RSJ, Inc.,* 552 N.W.2d 695, 701 (Minn.1996). As a result, we decline to invalidate the civil penalty.[6]

In sum, we conclude that the award of damages based on a finding of racial discrimination is supported by substantial evidence and is not arbitrary and capricious.

## DECISION

We affirm the commission's finding that relator unfairly discriminated against Kel-

ly in the decision to arrest and jail him for misdemeanor violations. We also affirm the commission's award for emotional and punitive damages and the imposition of a civil penalty on relator.

**Affirmed.**

HARTEN, Judge,* dissenting.

I respectfully dissent from the majority's affirmance of the decision of respondent Minneapolis Civil Rights Commission. The record on which the commission made its analysis and found discrimination is fatally deficient. The commission identifies no overt police racial discrimination; instead, it relies on its own obscure notion of constructive racial discrimination, beginning with an unwarranted assumption and proceeding directly to a foregone conclusion.

As a threshold matter, I refuse to subscribe to the majority's view that the commission's decision is entitled to an altered scope of review because the commissioners sat as a jury. We review a jury's verdict by making "a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Brown,* 732 N.W.2d 625, 628 (Minn.2007). But the commission is not a jury: it is an administrative agency, and its decisions are reviewed under the standards set out in the Administrative Procedures Act (APA). Minneapolis, Minn., Code of Ordinances § 141.60(b) (2008). Specifically, we reverse the commission's findings if they are "unsupported by substantial evidence in view of the entire record as submitted" or

---

6. If the payment by MPD to the Minneapolis general fund is circular, the city can handle the issue internally.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

"arbitrary and capricious." Minn.Stat. § 14.69(e), (f) (2008). I believe the majority blurs the line between these standards of review by giving added weight to the commission's "hybrid-jury" findings.[1]

> A finding of discrimination
>
> may be made when the record establishes (1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for the existence of an impermissible factor such as race, color, creed, sex, etc.; or (2) treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation.

*City of Minneapolis v. Richardson*, 307 Minn. 80, 87, 239 N.W.2d 197, 202 (1976). *Richardson*, on which the majority relies extensively, is readily distinguishable on its facts.[2] It involved police officers who threatened a crowd that included a 12–year–old African–American youth; used police dogs that attacked the youth; dragged the youth by his feet, face down, to a squad car; and used racial epithets to disparage the youth while taking him to the station. *Id.* at 82–83, 239 N.W.2d at 200. The officers' use of racial slurs "coupled with" their egregious acts supported the inference that they had a racially discriminatory motive. *Id.* at 89, 239 N.W.2d at 203.

The decision of officers Villamor and Dubay to arrest Kelly was a far cry from the shameful behavior of the *Richardson* officers. Officers Villamor and Dubay used what the commissioner has deemed "reasonable force" to apprehend a notably defiant, possibly armed, and struggling suspect. In the heat of that struggle, they decided to arrest, based on their impression that Kelly, who admitted to being angry, would scoff at a citation. *See* Minn. R.Crim. P. 6.01, subd.(1)(a) (providing that law enforcement officers may arrest for misdemeanors if "it reasonably appears to the officer ... *that there is a substantial likelihood that the accused will fail to respond to a citation.*") (Emphasis added). The officers' testimony reflects their compliance with this rule.

Officer Villamor testified that he decided to arrest "[b]ecause I believe that [Kelly] would have failed to respond to a citation." Asked why he believed this, Villamor replied, "Because of his level of uncooperativeness and resistance."

Officer Dubay testified, "[Kelly] was placed under arrest for disorderly conduct and obstructing the legal process. His actions—his belligerent action, his vulgarity out in a public place, the fact that Officer Villamor had to use force on Mr. Kelly. From experience I believe that Mr. Kelly would not have accepted a citation because he was too angry." When asked why he believed this, Dubay answered, "From my experience, the disorderly way that he was conducting himself in a public place, drawing attention to himself from

---

1. For other reasons, I find highly problematic the commission's use of a jury-trial format in making its determination. As a "jury," the commission panel is not composed of a cross section of the community; nor is it subject to voir dire and strikes that would eliminate biased individuals from the jury. The use of such a "hybrid jury" is an invalid attempt to simulate jury procedure and then claim its virtues.

2. *Beaulieu v. City of Mounds View*, 518 N.W.2d 567 (Minn.1994), on which the majority also relies, is distinguishable procedurally, because it concerned the denial of a motion for summary judgment, *id.* at 569, and substantively, because it concerned the application of official immunity to a Human Rights Act claim, *id.*, and because it concerned officers who acted in bad faith. *Id.* at 573.

other people, people gathering around, [and] it is my experience that if [an officer is] issuing someone a citation instead of bringing them to jail, because they're so upset, that a lot of times they won't respond," and, "In my experience, sir, given his behavior that day, I do not believe he would have responded to a citation. I've been doing this for a long time."

Asked what sort of things Kelly was yelling and screaming, Officer Dubay testified, "[T]hat we were racist, that we were brutalizing him, you know, ... and he made some comments to Officer Villamor [an Asian American] that his white masters had brainwashed him...." Officer Dubay answered "No" when asked if he "[made] any racially derogatory remarks to Mr. Kelly" or "[heard] any [other] police officers make any derogatory remarks to Mr. Kelly". Both Dubay and Villamor answered "No" when asked if they "use[d] any force on Mr. Kelly because of his race"; "treat[ed] Mr. Kelly any differently than [they] would have treated a nonAfrican-American under those circumstances"; and "arrest[ed] Mr. Kelly because of his race."

A suspect's defiance and yelling can provide the basis for an officer's reasonable belief that a citation will be ignored. *See, e.g., In re Welfare of T.L.S.*, 713 N.W.2d 877, 881–82 (Minn.App.2006) (no rule 6.01 violation in arrest of student who was shrieking and swearing and refused to leave school building).[3] The majority concedes that Kelly "continued to resist being handcuffed and refused to enter the squad car"—a show of defiance. Given the *T.L.S.* precedent, I consider the commission's finding of a violation of rule 6.01 in this case to be highly dubious.

At least equally dubious is the commission's finding of pretextual behavior on the part of the officers. The record provides insufficient explanation or support for the commission's finding of pretextual behavior, and only confirms what the officers testified and the majority concedes: Kelly was defiant and dismissive of the legal process. Though the commission briefly noted that Kelly was pacified by the officers after a significant struggle, it in no way rebutted the plain fact that Kelly was defiant and remained extremely angry at the time of arrest. The commission must provide adequate explanations for its factual findings. *Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n*, 342 N.W.2d 324, 330 (Minn.1983). There is no adequate explanation for the finding that the officers' stated reasons for taking a defiant and disruptive suspect to jail were merely pretextual.

Moreover, a commission's finding may be reversed when a "combination of danger signals ... suggest[s] the [commission] has not taken a hard look at the salient problems and the decision lacks articulated standards and reflective findings." *Cable Commc'ns Bd. v. Nor–West Cable Commc'ns P'ship*, 356 N.W.2d 658, 669 (Minn.1984) (quotations omitted). Because the finding of pretext satisfies neither reason nor the substantial-evidence test it should, in my view, be reversed.

Even assuming that there was a violation of Minn. R.Crim. P. 6.01, a review of the record reveals no evidence connecting

---

**3.** Violations of rule 6.01 have been a basis for excluding evidence obtained incident to arrests. *See, e.g., State v. Richmond*, 602 N.W.2d 647, 653 (Minn.App.1999) (finding violation when conduct of suspect arrested for a misdemeanor was limited to not answering questions, not immediately producing a driver's license, and removing his hands after being directed to keep them on the squad car), *review denied* (Minn. 18 Jan. 2000); *State v. Carver*, 577 N.W.2d 245, 249–50 (Minn.App.1998) (finding violation where suspect was arrested for petty misdemeanor).

the officers' behavior to any racial motive. In contrast, *Richardson* found "substantial evidence of discrimination because of race ... [from the suspect's] uncontradicted testimony ... that two ... police officers addressed him in a racially derogatory manner." *Richardson*, 307 Minn. at 88, 239 N.W.2d at 203. The officers here used no epithets or any other language that could imply racial discrimination. Kelly did not produce any quantitative data or expert testimony linking their actions to racial animus. In fact, the only racial slurs in the record came from Kelly himself, who repeatedly used racially tinged insults and referred to the Asian–American Officer Villamor as a "white slave."

The "so at variance" test requires discrimination to be the *"probable* explanation." *Richardson*, 307 Minn. at 87, 239 N.W.2d at 202 (emphasis added). Under that nebulous standard, I find it essential that those alleging discrimination show some evidence supporting a fair inference of the officers' alleged improper discriminatory motive. Where the record indicates no nexus between an officer's conduct and such a motive, a civil rights claim cannot prevail.

I conclude that, absent any evidence to support an inference of discrimination or a finding of pretext, the commission's ruling was an exercise of "[its] will rather than its judgment." *In re Max Schwartzman & Sons, Inc.*, 670 N.W.2d 746, 753 (Minn. App.2003) (holding that agency decision is arbitrary and capricious when it reflects the agency's will rather than its judgment). For this reason, I would reverse the ruling as "unsupported by substantial evidence" and "arbitrary and capricious." Minn.Stat. § 14.60(e), (f).