*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0496**

In the Matter of the Appeal by Primrose School of Arden Hills and Shoreview
of the Order of License Revocation.

**Filed April 22, 2024**
**Affirmed**
**Wheelock, Judge**

Department of Human Services
File No. 37862

Michael Fondungallah, Fondungallah & Kigham, LLC, St. Paul, Minnesota (for relator Primrose School of Arden Hills and Shoreview)

Keith Ellison, Attorney General, R.J. Detrick, Assistant Attorney General, St. Paul, Minnesota (for respondent Minnesota Department of Human Services)

Considered and decided by Slieter, Presiding Judge; Wheelock, Judge; and Schmidt, Judge.

**NONPRECEDENTIAL OPINION**

**WHEELOCK**, Judge

Relator childcare facility challenges the amended final order of the commissioner of human services that imposed a fine and conditional license for relator's violation of the Minnesota Department of Human Services Background Studies Act (BSA), Minn. Stat. §§ 245C.01-.34 (2022), and withholding or providing false or misleading information during an investigation. Relator argues that the amended final order was (1) affected by

an error of law, (2) not supported by substantial evidence, and (3) arbitrary or capricious. We affirm.

## FACTS

On June 29, 2021, respondent Minnesota Department of Human Services (DHS) sent a licensor to conduct an unscheduled "early and often" review (the "on-site review")[1] of relator Primrose School of Arden Hills and Shoreview (Primrose). Primrose is a childcare center that serves roughly 200 children and opened in 2019. Primrose is owned and operated by Saleem Karmaliani,[2] who operates several childcare centers in Minnesota.

During the licensor's visit, she observed a child in a classroom alone with an adult who was not a member of Primrose's staff, and the child had not been signed out of Primrose at the time. The person with the child was a behavioral therapist from the Lovaas Institute. Lovaas employs certified mental-health providers and is authorized by the state to provide direct therapy for children in schools, preschools, and daycares. To maintain its certification, Lovaas must complete background checks for all of the providers it employs. The child had been attending Primrose for only one week at the time of the licensor's visit, and the child's mother had emailed the Primrose director to request that the therapist from Lovaas be allowed to work with the child in a Primrose classroom during the day. The

---

[1] An "early and often" review is an on-site review of a program conducted quarterly during the first year the program is licensed. Due to changes to the site-visit procedures that resulted from the COVID-19 pandemic, Primrose was still being reviewed under the "early and often" program notwithstanding that it had been licensed for nearly two years.

[2] Mr. Karmaliani worked for DHS for approximately 15 years before operating Primrose programs.

therapist worked with the child on three occasions at Primrose, including the day of the licensor's visit.

During the on-site review, the licensor confirmed with Primrose staff that no Primrose staff had either signed the child out for the therapy session or supervised the therapist and the child during their session. The licensor also confirmed with the Primrose director that the therapist did not have a DHS background study initiated by Primrose and independently confirmed that the therapist did not have a DHS background study initiated by any other organization.

On July 1, 2021, the licensor conducted an exit interview over the phone with Karmaliani and the Primrose director, at which time the licensor informed them that there would be a $200 fine for failure to conform with the background-study requirements[3] for the Lovaas therapist who worked with the child. After hearing this, Karmaliani stated to the licensor that a Primrose staff member was present in the classroom with the therapist and the child at "that time." Karmaliani then offered to provide video footage of the hallway outside the classroom to support this statement. The licensor explained to him that the footage would need to cover the duration of the therapist's work with the child on that day to avoid the fine.

Later that day, Karmaliani emailed the licensor four brief surveillance video clips of the hallway outside of the classroom in which the therapist and the child met. He

---

[3] Throughout this opinion, the phrase "background-study requirements" refers to the requirements outlined in Minn. Stat. § 245C.02, subd. 6a. Section 245C.02, subdivision 6a, is the only part of the BSA at issue in this case.

asserted that the videos were taken during the time of the licensor's visit and that they would show that a Primrose staff person was present while the therapist worked with the child. However, the videos did not cover the duration of the therapy session; instead, they contained only a few minutes of footage that showed one of the Primrose teachers entering the classroom and the licensor appearing to observe the room about two minutes later. The video clips did not show the therapist and the child entering the classroom to start the therapy session or the teacher—who, Karmaliani asserted, had been with the therapist and child throughout the session—leaving the classroom. Karmaliani later explained that the cameras are motion activated and do not record constantly.

After the exit interview with Karmaliani and the Primrose director on July 1, the licensor opened an investigation into Primrose based on Karmaliani's assertion that a teacher was present with the therapist and the child. The licensor determined that (1) during the exit interview, Karmaliani claimed a Primrose staff person was present in the room with the therapist and the child; (2) during the on-site review, the licensor did not see anyone else in the classroom when she observed it through a window in the classroom door; and (3) the videos Karmaliani provided did not support his claim. As part of the investigation, the licensor interviewed the Lovaas therapist, who stated that Primrose did not provide staff to supervise her and the child during their work. The licensor also interviewed the Primrose teacher shown in the videos whom Karmaliani had identified as the Primrose staff person present in the room with the therapist and the child. The teacher stated that she did not supervise the child when she entered the classroom during the

4

therapist's work with the child and that she only went into the classroom briefly to collect some games and activities.

On August 8, 2021, the licensor conducted a second interview with Karmaliani and informed him that DHS intended to take licensing action because Karmaliani provided false and misleading information when he said that a Primrose staff person was present the entire time the therapist provided services to the child on the day of the on-site review. DHS revoked Primrose's license in September 2021. Primrose appealed the order and requested a contested-case hearing.

An administrative law judge (ALJ) conducted an evidentiary hearing in February 2022 and issued findings of fact, conclusions of law, and a recommendation two months later. The ALJ found that the therapist was not affiliated with Primrose and thus that DHS failed to meet its burden to establish reasonable cause to believe that Primrose violated the background-study requirements. The ALJ also determined that DHS failed to meet its burden to establish reasonable cause to believe that Primrose knowingly provided false or misleading information to DHS, finding that the licensor did not clarify what Karmaliani meant by his use of the phrase "that time" during the exit interview on July 1. The ALJ further determined that DHS refused to accept Primrose's offered proof of parental consent to services and the care plan for the child. Based on these findings, the ALJ determined that DHS had no grounds to sanction Primrose, DHS imposed an unnecessarily severe sanction given that no harm came to the child, and the sanction deprived children and parents of what DHS had called a "great program."

5

DHS's attorney filed exceptions to the ALJ's decision,[4] but due to an administrative error, the commissioner of human services did not receive the exceptions before the agency issued a final order in August 2022 in which the commissioner adopted the ALJ's findings, conclusions, and recommendation to rescind the revocation. DHS's attorney filed a request for reconsideration of the final order, drawing attention to the filed exceptions.

In November 2022, the commissioner issued an amended final order in which the agency reversed course, adopting many of the DHS attorney's exceptions, amending the findings of fact based on review of the exceptions, and imposing sanctions on Primrose. The commissioner determined, based on the amended findings of fact, that the therapist was affiliated with Primrose, Primrose did not satisfy the exceptions to the background-study requirements, and Primrose provided false or misleading information during an investigation. The commissioner determined, however, that the initial sanctions imposed were too harsh, and she rescinded the revocation of the license and instead ordered Primrose to pay the $200 fine and operate with a conditional license for one year. Primrose requested that the commissioner reconsider the amended final order, but the commissioner declined to do so and affirmed it.

Primrose appeals by writ of certiorari.

---

[4] The Minnesota Administrative Procedure Act (MAPA), Minn. Stat. §§ 14.001-.69 (2022), requires that after the ALJ provides their report pursuant to a contested-case hearing, each adversely affected party must be given time to file exceptions with the agency officials who will make the final decision. Minn. Stat. § 14.61, subd. 1; *In re Surveillance & Integrity Rev. Appeals*, 996 N.W.2d 178, 185 (Minn. 2023). Prior to appealing the order to the courts, a party may also make a request for reconsideration to the agency after it issues its final order. Minn. Stat. § 14.64.

**DECISION**

MAPA governs our review of the decision of an administrative agency after a contested-case hearing. *See* Minn. Stat. § 14.63. An appellate court "may reverse or modify the [agency's] decision if the substantial rights of the petitioners may have been prejudiced" by the agency's findings, inferences, or conclusions because they were affected by an error of law, unsupported by substantial evidence in view of the entire record, or arbitrary or capricious. Minn. Stat. § 14.69(d)-(f); *Johnson v. Minn. Dep't of Hum. Servs.*, 565 N.W.2d 453, 457 (Minn. App. 1997). "Agency decisions enjoy a presumption of correctness and warrant deference by courts." *In re Appeal by Waters*, 977 N.W.2d 874, 885 (Minn. App. 2022) (quoting *Kind Heart Daycare, Inc. v. Comm'r of Hum. Servs.*, 905 N.W.2d 1, 9 (Minn. 2017)).

An agency bears the burden of proof when it must "demonstrate reasonable cause for action taken." Minn. Stat. § 245A.08, subd. 3(a) (2022). Reasonable cause means "the existence of circumstances sufficient to warrant a cautious person to reasonably believe" that the relator did not comply with the applicable law or regulation. *See In re Temp. Immediate Suspension of Fam. Child Care License*, 777 N.W.2d 41, 46 (Minn. App. 2010). If the agency meets its burden, the burden then "shifts to the license holder to demonstrate by a preponderance of the evidence that the license holder was in full compliance with those laws or rules that the commissioner alleges the license holder violated." Minn. Stat. § 245A.08, subd. 3(a). The relator bears the burden to prove grounds for this court to reverse the agency's decision. *Johnson*, 565 N.W.2d at 457.

7

We defer to the administrative agency's expertise and fact-finding but review questions of law de novo. *In re NorthMet Project Permit*, 959 N.W.2d 731, 744 (Minn. 2021); *Pfoser v. Harpstead*, 939 N.W.2d 298, 308 (Minn. App. 2020), *aff'd*, 953 N.W.2d 507 (Minn. 2021).

Primrose challenges the commissioner's decision in three ways, arguing that the decision was (1) affected by an error of law, (2) not supported by substantial evidence, and (3) arbitrary or capricious. We address each of these arguments in turn.

## I. The commissioner's amended final order was not affected by an error of law based on the definition it applied to determine whether the therapist was "affiliated" with Primrose.

DHS asserts that the therapist was subject to the BSA's background-study requirements because the therapist was affiliated with Primrose and that Primrose violated the BSA because Primrose did not conduct a background study of the therapist or comply with the statutory exceptions[5] to that requirement. The relevant portion of the BSA states:

> "Childcare background study subject" means an individual *who is affiliated with* a licensed childcare center . . . and who is . . .
> (8) a volunteer, contractor providing services for hire in the program, prospective employee, or other individual who has unsupervised physical access to a child served by a program and who is not under supervision by an individual

---

[5] The parties do not dispute that if the BSA applies to the therapist, Primrose did not satisfy the exception to the background-study requirements set forth in Minn. Stat. § 245C.02, subd. 6a(b).

> listed in clause (1) or (5), regardless of whether the individual provides program services.

Minn. Stat. § 245C.02, subd. 6a(a)(8) (Supp. 2023) (emphasis added).[6] The commissioner determined that the therapist falls within the ambit of subdivision 6a(a)(8).

Primrose argues that the commissioner erred as a matter of law when she applied an incorrect definition of the term "affiliated" to determine that the therapist was affiliated with Primrose. Primrose maintains that the ALJ's definition, from the *Merriam-Webster Dictionary*, for the term "affiliated"—"closely associated with one another typically in a dependent or subordinate position"—was correct. Primrose argues that when the term is given its plain meaning, it is clear that the therapist is not affiliated with Primrose because (1) Primrose's only connection to the therapist was to provide space in its facility for the therapist to work with the child and (2) the child's parent pays Lovaas for the therapist's work and provided Primrose with permission for the therapist to work with the child.

DHS argues that the commissioner did adopt the ALJ's definition of "affiliated" because the amended final order did not modify the ALJ's conclusion of law that stated, "'[a]ffiliated' means to be 'closely associated with another typically in a dependent or subordinate position.'" DHS asserts that the commissioner applied a correct definition of the term and then correctly concluded that the therapist was affiliated with Primrose under the BSA because the therapist was both "closely associated" with Primrose and "in a

---

[6] We cite the most recent version of Minn. Stat. § 245C.02, subd. 6a(a)(8), because it has not been amended in relevant part. *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (stating that, generally, "appellate courts apply the law as it exists at the time they rule on a case").

9

dependent or subordinate position" to Primrose because the therapist depended on Primrose to provide space for her to work with the child. DHS also points out that the record reflects that other therapists from Lovaas regularly provide services at Primrose, which supports the determination that the therapist here had a close association with, and was thus affiliated with, Primrose.[7]

We agree that the commissioner's amended final order adopted the definition of "affiliated" that the ALJ applied and do not see a dispute between the parties about the definition of the word "affiliated"; rather, the dispute is about the application of the definition to these facts—whether relying on Primrose to provide space for the therapist to work with the child makes the therapist sufficiently dependent on Primrose to be affiliated with it for purposes of the background-study requirements. Although Primrose frames this argument as one of statutory interpretation, and therefore subject to de novo review by our court, we do not discern any need for statutory interpretation. The parties' dispute is related to a factual determination, for which we defer to the agency's special knowledge and expertise.

When reviewing agency decisions, we defer to "the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *In*

---

[7] DHS makes additional arguments addressing the ALJ's interpretation of the term "affiliated" and the ALJ's conclusion that the therapist was not affiliated with Primrose. DHS specifically raises concerns that Primrose's interpretation effectively limits the scope of the BSA, rendering portions of it meaningless and subverting the purpose of the BSA's background-study requirement, which is to ensure the safety of people receiving services from DHS-licensed facilities. We affirm the commissioner's amended final order without reaching these arguments.

*re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001) (quotation omitted). We may not substitute our own conclusions for those of the agency when it concerns a matter of factual determination. *See In re Application of Minn. Power*, 838 N.W.2d 747, 759 (Minn. 2013) (deferring to the commission's decision as to whether a statutory standard was met); *In re Application of Enbridge Energy, Ltd. P'ship*, 964 N.W.2d 173, 198 (Minn. App. 2021) (determining that whether the evidence satisfies the statutory requirements is a factual inquiry), *rev. denied* (Minn. Aug. 24, 2021); *Minneapolis Police Dep't v. Kelly*, 776 N.W.2d 760, 766 (Minn. App. 2010) (determining that whether the ordinance prohibited the conduct is a fact issue for the specific skills of the commission), *rev. denied* (Minn. Mar. 30, 2010).

Whether a person is affiliated with a DHS-licensed childcare center such that the center may be required to comply with the BSA is a factual determination that requires DHS to use its own special knowledge and expertise. The commissioner determined that, based on a plain reading of subdivision 6a(a)(8) of the BSA, Primrose must have a background study completed on any person affiliated with the childcare center, even if that person provides services beyond those of the childcare center. *See* Minn. Stat. § 245C.02, subd. 6a(a)(8). The commissioner then applied the definition of "affiliated" that the ALJ provided and Primrose supports, and she further determined that the therapist was affiliated with Primrose and subject to the requirements of the BSA. Because we do not substitute our own conclusion for the conclusion of the agency on a matter of factual determination

11

and defer to the agency's determination, we conclude that the commissioner's amended final order was not affected by an error of law.[8]

## II. The commissioner's determinations that Primrose violated the BSA and provided false or misleading statements were supported by substantial evidence in view of the entire record.

Primrose next argues that substantial evidence in the record does not support the commissioner's determinations that Primrose (1) violated the BSA requirements and (2) provided false or misleading statements during the DHS investigation. "The supreme court has defined the substantial-evidence standard as such evidence that a reasonable person would accept as adequate to support a conclusion" and has stated that it requires "more than a scintilla of evidence, more than some evidence, and more than any evidence." *Waters*, 977 N.W.2d at 885 (quotations omitted). When determining whether substantial evidence in the record supports an agency's decision, we evaluate "whether the evidence as a whole supports the commissioner's decision." *Pfoser*, 939 N.W.2d at 318. And we "defer to an agency's conclusions regarding conflicts in testimony . . . and the inferences to be drawn from testimony." *In re Admin. Order Issued to Wazwaz*, 943 N.W.2d 212, 216 (Minn. App. 2020) (quoting *Blue Cross & Blue Shield of Minn.*, 624 N.W.2d at 278), *rev. denied* (Minn. June 30, 2020).

Although there are different ways to determine whether an agency's decision is supported by substantial evidence, the legal principle is the same: "a substantial-evidence

---

[8] Primrose does not assert that there is not substantial evidence to support the commissioner's determination that the therapist is affiliated for the purposes of the BSA. We conclude that substantial evidence supports the commissioner's factual finding that Primrose provided space for the therapist to work with the child.

analysis requires [this court] to 'determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record.'" *NorthMet Project*, 959 N.W.2d at 749 (quoting *Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n*, 342 N.W.2d 324, 330 (Minn. 1983)). When an agency makes inferences, they must be accepted by a reviewing court "even though it may appear that contrary inferences would be better supported or that the reviewing court would be inclined to reach a different result were it the trier of fact." *Ellis v. Minneapolis Comm'n on C.R.*, 295 N.W.2d 523, 525 (Minn. 1980). With this standard in mind, we turn to the two determinations that Primrose challenges on this basis.

## A. Violation of BSA

Primrose argues that the commissioner's determination that it violated the background-study requirements is not supported by substantial evidence because the therapist did not have unsupervised access to the child, which is a prerequisite to application of the BSA. *See* Minn. Stat. § 245C.02, subd. 6a(a)(8). Primrose asserts that the child was always within hearing of a Primrose staff member so that staff was "capable at all times of intervening to protect the health and safety of the person served by the program," as required by Minn. Stat. § 245C.02, subd. 8. Primrose states that DHS did not provide evidence that teachers in other classrooms, including the adjacent classroom, could not hear the child or intervene while the child worked with the therapist and that, because supervision occurs when a child is within sight or hearing, there is insufficient proof that the therapist had "unsupervised physical access" to the child or that they were "not under supervision by" an individual identified in the statute. *See id.*

13

DHS argues that the record contains substantial evidence to show that Primrose did not have the therapist under continuous direct supervision while working with the child because the evidence, including the video clips that Primrose provided, shows that the classroom door to the room with the child and therapist and other classroom doors were closed and that no Primrose staff was in the room with the child and therapist. DHS further argues that no teacher would think to listen for the child because no one was tasked with supervising the child during the time she was with the therapist and because the teachers in the other classrooms were focused on teaching and supervising the children in their own classrooms. Moreover, DHS points out that Primrose conceded this violation.

The commissioner made several findings of fact relevant to her determination that Primrose violated the BSA, including the following: no Primrose staff was consistently present in the classroom in which the therapist provided services to the child while the therapist provided those services; a Primrose teacher went into the classroom in which the therapist and the child were working, but only briefly to retrieve board games to take back to the adjacent classroom in which she was assigned to work; the teacher was not assigned to supervise the child during that time; the licensor looked into the classroom a second time before concluding the on-site review and again observed that the therapist and the child were alone together in the room; there are two classrooms on the second floor of Primrose's building—one was the classroom in which the child and the therapist met, and the other was not the child's regular classroom. In the amended final order, the commissioner rejected the notion that the child was sufficiently within hearing or sight of Primrose staff to be supervised by the staff because the doors to the classrooms were closed and because

14

the teacher in the adjacent classroom was not responsible for supervising the child and had a separate classroom of children for whom she was responsible during the relevant time.

The record also contains a statement from the Primrose teacher who Karmaliani alleged was supervising the child and the therapist—the same teacher who briefly retrieved board games from the classroom. In the statement, the teacher expressly denied supervising the child at any time during the session with the therapist. And the record contains Karmaliani's testimony before the ALJ and his exit-interview statements in which he admitted that the therapist was alone with the child for at least some period of time and that the teacher from the adjacent classroom was not, in fact, assigned to supervise the therapist and the child. This evidence overwhelmingly supports the commissioner's legal conclusion that "there is reasonable cause to believe that [the therapist] was not under 'continuous, direct supervision' by Primrose staff while she worked with the child." We conclude that the record contains substantial evidence that amply supports the commissioner's amended final order determining that Primrose violated the background-study requirements.

## B. Providing False or Misleading Statements

Primrose argues that the commissioner's determination that Primrose provided false or misleading information is not supported by substantial evidence for two reasons. First, Primrose's statement that one of its teachers was present in the classroom with the therapist and the child is supported by and consistent with the video clips it provided to DHS, and second, DHS mischaracterized Primrose's statements about the teacher's presence and the video evidence. Primrose also suggests that because it was cooperative, providing

opportunities for the licensor to talk with that teacher and other staff and sharing information regarding the child's care plan and the parent's consent, Primrose cannot have withheld information from DHS. The false or misleading information at issue here, however, included (1) Primrose's statements claiming that a Primrose teacher was in the classroom with the therapist and the child; and (2) Karmaliani's assertion that the video clips he provided to DHS would support those statements.

DHS argues that substantial evidence in the record demonstrates that Primrose provided false or misleading information. DHS points to evidence in the record that Karmaliani made conflicting statements about whether the therapist and the child were alone in the classroom together; another Primrose staff person also claimed that a Primrose teacher was in the classroom during the therapy session; Karmaliani was referring to the entire duration of the therapy session when he stated that a Primrose teacher was in the classroom; and Karmaliani asserted that the video clips would show that Primrose did not commit a background-study violation.

The commissioner determined in her amended final order that Primrose withheld relevant information and provided false or misleading information because Karmaliani stated during the exit interview that a Primrose teacher was in the room with the therapist and the child throughout the therapy session, the commissioner credited the licensor's testimony about speaking with the Primrose director during the inspection about the therapist being alone with the child and found that the videos provided did not show that the Primrose teacher was in the classroom with the therapist and the child when the licensor observed them.

Primrose asserts that DHS mischaracterized Karmaliani's statements to the licensor after she informed him of the violation of the background-study requirements; however, the recordings of the exit interview are part of the record, and the commissioner was able to review them without relying on any characterization of the statements by the licensor, DHS, or the ALJ. Primrose attempts to cast doubt on DHS's understanding of Karmaliani's statements by arguing that he intended his use of the phrase "that time" to refer only to the narrow timeframe during which the licensor first looked into the classroom and observed the therapist and the child alone, rather than to the entirety of the therapy session.[9] But we "defer to an agency's conclusions regarding conflicts in testimony," *Wazwaz*, 943 N.W.2d at 216, and we will not reweigh the evidence. Here, where the commissioner determined, after weighing the evidence, that Primrose knowingly withheld relevant information from or provided false or misleading information to DHS in connection with the background-study status of an individual during an investigation, we conclude that substantial evidence supports that finding.

---

[9] After being informed during the exit interview that Primrose would be fined for not complying with the background-study requirements, Karmaliani said:

> It happened to be that . . . we looked at the records as well— that I had our own teacher present in that room at the same time. Now that teacher was, happened to be there in that room. She's our own teacher. She was present in that room when this child was observed and being taken care of. Throughout *that time* the other kindergarten licensed teacher was present in that classroom. So we, technically that child and that provider was not alone. Technically there was another staff person present throughout *that time*. We didn't intentionally put that person in there that's the honesty of it. But from a technicality that person was not alone without a teacher of our own.

(Emphases added.)

Because a reasonable person could accept that the evidence as a whole supports the commissioner's determinations in the amended final order that Primrose violated the background-study requirements and provided false or misleading information, we conclude that Primrose's claim that the amended final order was not supported by substantial evidence fails.

## III. The commissioner's determinations were not arbitrary or capricious.

Primrose argues that the commissioner's amended final order was arbitrary or capricious because the decision relied on factors unintended by the legislature, failed to consider an important aspect of the problem, offered an explanation contrary to the evidence, and decided the matter in a way that cannot be explained.

This court may reverse an agency decision if the agency's findings, inferences, or conclusions are "arbitrary or capricious." Minn. Stat. § 14.69(f). A decision is arbitrary or capricious "if it is an exercise of the agency's will, rather than its judgment, or if the decision is based on whim or is devoid of articulated reasons." *Pfoser*, 939 N.W.2d at 308 (quoting *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 565 (Minn. App. 2001), *rev. denied* (Minn. Nov. 13, 2001)); *see Waters*, 977 N.W.2d at 885. When a final agency decision, or even an amended final decision, departs from the recommendations of the ALJ, this does not heighten the standard of review applied to the agency's final decision. *In re Excelsior Energy Inc.*, 782 N.W.2d 282, 289 (Minn. App. 2010). Ultimately, the agency must only consider the recommendations of the ALJ, Minn. Stat. § 245A.08, subd. 5 (2022); it is not bound by them.

18

Here, the commissioner thoroughly explained each of her findings and conclusions in the amended final order and supported them with citations to the record. In issuing the amended final order, the commissioner considered the entire record, including the record produced during the investigation and the hearing, as well as the ALJ's findings, conclusions, and recommendations. The commissioner further relied on additional portions of the licensor's testimony from the contested-case hearing that are set forth in the amended final order and that the ALJ did not reference in her recommended findings. Although Primrose disagrees with the amended final order because the commissioner did not agree with the ALJ's ultimate conclusions about whether Primrose violated the BSA or provided false or misleading information, the commissioner was not required to adopt those recommendations for the amended final order. Rather, it is clear that the commissioner considered the ALJ's recommendations and articulated when and why she diverged from those recommendations in the amended final order. This is consistent with an exercise of the agency's judgment rather than its will. *See Waters*, 977 N.W.2d at 885. Because the commissioner considered the ALJ's recommendations and provided adequate explanations and support for each of the findings and determinations in the amended final order, we conclude that the amended final order was not arbitrary or capricious.

In sum, the commissioner's amended final order was not affected by error of law, was supported by substantial evidence, and was not arbitrary or capricious. Because Primrose has not demonstrated any reason why this court should reverse the commissioner's amended final order, we affirm.

**Affirmed.**

19