James F. CANNON, Respondent,

v.

**MINNEAPOLIS POLICE DEPARTMENT, Relator,**

City of Minneapolis, Commission on Civil Rights, Respondent.

No. A09–1154.

Court of Appeals of Minnesota.

June 1, 2010.

David L. Shulman, Law Office of David L. Shulman PLLC, Minneapolis, MN, for respondent James F. Cannon.

Susan L. Segal, Minneapolis City Attorney, Timothy S. Skarda, Assistant City Attorney, Minneapolis, MN, for relator.

Considered and decided by LANSING, Presiding Judge; HALBROOKS, Judge; and CONNOLLY, Judge.

## OPINION

HALBROOKS, Judge.

Relator Minneapolis Police Department (the department) brings this certiorari appeal from a determination by respondent Minnesota Commission on Civil Rights (the commission) that the department engaged in reprisal discrimination. The department challenges the final determination on five grounds: (1) the record does not contain substantial evidence to support the commission's decision on the issue of reprisal; (2) the commission exceeded its authority by doubling the award for mental-anguish damages; (3) relator is not a proper party to a charge of discrimination; (4) the commission should have recused; and (5) the commission evidenced bias. Because we conclude that the commission improperly doubled the award for mental-anguish damages, we modify the judgment to the original award of $15,000. But because we conclude that the judgment is proper in all other respects, we affirm as modified.

## FACTS

Respondent James Cannon brought a charge of discrimination to the commission, alleging racial discrimination and reprisal discrimination by employees of the department. Cannon's charge was based on an incident that occurred on September 5, 2006, when Cannon, his wife Lois Cannon (Lois), and his son James Cannon Jr.

(James), went to Wrecker Services, Inc., a towing facility in Minneapolis, to retrieve a towed vehicle. The family arrived at Wrecker's at approximately 9:45 p.m.; but after paying the towing fee, respondent was informed that the vehicle was unavailable and that they would have to wait. Over the next 45 minutes, four other people arrived at Wrecker's to pick up their towed vehicles. They were similarly informed, after they had paid the fees, that they would need to wait. The individuals, all of whom were African or African American, waited in Wrecker's small lobby.

At some point while the individuals were waiting, a male (not Cannon) struck the plexiglass window that separated the lobby from the area where the Wrecker's employee was working and demanded his car. In response, the Wrecker's employee called 911, and relator dispatched Officers Julie Hagen and Michael Meath. Dispatch provided the officers with the following information: "Cust in lobby yelling at clr and banging on glass. Mad because they want their car immediately but tow driver isn't there." When the officers arrived at Wrecker's, they bypassed the individuals in the waiting room and spoke directly to the employee who had called 911.

The commission found that other than the incident involving the plexiglass window, "no other loud or disruptive conduct occurred while the Cannon family was waiting for their vehicle to be released. The Cannon family and other persons waiting were quiet or talking in a conversational tone...." Likewise, "[n]one of the customers waiting for their vehicles were acting unruly or speaking loudly when the [o]fficers arrived." Officer Hagen testified at the hearing that the individuals in the waiting room were speaking loudly when the officers arrived, but the commission

credited the testimony of the Cannons regarding the tenor of the waiting room.

When addressing the crowd in the waiting room, Officer Hagen yelled loudly that the next person to touch the plexiglass window would go to jail for disorderly conduct. Officer Hagen also stated, "I want you to shut up and behave yourselves! You need to act like adults!" Officer Hagen testified that she spoke in a loud, authoritative tone. But the Cannons testified that she screamed at the top of her lungs when addressing the waiting room. There is no dispute that Officer Hagen did not address anyone individually or ask who had hit the window, but instead spoke to the group in the waiting room as a whole. In response, Lois told Officer Hagen that she did not "need to use that tone," to which Officer Hagen replied that she would "use any tone I damn well please." Cannon attempted to explain the situation to Officer Hagen, including the fact that everyone had been waiting for approximately 45 minutes, and Officer Hagen replied, "I don't care if you've been waiting four days." Officer Hagen testified that Lois called her a racist, which she felt was extremely inappropriate; Officer Meath also testified that Lois called them racist. Lois denied making this statement to Officer Hagen, and the commission concluded that her testimony was more credible.

Following this exchange, Cannon and his family decided to leave Wrecker's without their vehicle. Before leaving, Cannon stated in front of Officer Hagen, "I think this is discrimination. I'm going to file a complaint." Officer Hagen replied that Cannon could not do anything to her. At the hearing, Cannon introduced the statements of two individuals who had also been at Wrecker's to pick up vehicles that evening; those statements corroborated much of the Cannons' testimony, including the fact that Officer Hagen told Cannon that he could not do anything to her.

After the Cannons left Wrecker's office, Lois realized that she needed Officer Hagen's badge number in order to file a complaint. She reentered Wrecker's and attempted to write down the badge number. When Officer Hagen noticed Lois, she "yelled in a mocking manner, pointing to her badge, 'Yeah, you got my badge number! My badge number is 1019, got that?'" Officer Hagen repeated her badge number twice in a slow, mocking manner. Lois then left the office. She testified at the hearing that Officer Hagen's conduct made her feel intimidated and dehumanized.

Cannon and his family attempted to drive out of Wrecker's parking lot. Officer Meath, who up to that point had not been involved in the altercations, left Wrecker's lobby and walked into the parking lot. Officer Meath stood in front of the Cannons' car, writing the license-plate number on his hand. Cannon testified that he felt intimidated by this act and thought that Officer Meath's actions had to do with his statement regarding a complaint. Officer Meath agreed that he wrote down Cannon's license-plate information but testified that he did so because he "wanted to make sure there was a valid driver, there [were] no warrants on the vehicle, [and that] the vehicle wasn't stolen." Both Officer Meath and Officer Hagen testified that Officer Meath routinely ran license-plate checks, sometimes up to 30 per day, because at that time he was new to the force. According to Officer Meath, he did not hear Cannon say that he would be filing a complaint.

Cannon filed a charge of discrimination, alleging both racial and reprisal discrimination by the department's officers. The Minneapolis Department of Civil Rights made an initial determination that there

was probable cause to believe Cannon's allegations of discrimination. The matter was then referred to the commission for a contested hearing as required by ordinance. *See* Minneapolis, Minn., Code of Ordinances § 141.50(i) (2010). The department moved for recusal of the commission on the ground that Cannon had served on the commission from 1988 to 1998. The commission denied the department's motion for recusal, reasoning that Cannon's service on the commission more than ten years earlier did not create a reasonable appearance of impropriety. The commission also noted that none of the commission members assigned to Cannon's charge had been on the commission before 2002.

Following a contested hearing, two of the three panel members found that Cannon had proven by a preponderance of the evidence that the department engaged in reprisal discrimination. The commission concluded that Cannon did not meet his burden of proving racial discrimination.[1] The commission awarded Cannon $10,000 for past mental anguish and $5,000 for future mental anguish and then doubled the mental-anguish damages, for a total of $30,000. In addition, the commission imposed a civil penalty of $7,500 on the department to be paid into the fund for the City of Minneapolis. Cannon subsequently petitioned for reimbursement of attorney fees and costs in the amount of $22,283.09. The commission granted Cannon's petition and amended the judgment to include the amount of attorney fees. This certiorari appeal follows.

## ISSUES

I. Does the record contain substantial evidence to support the commission's determination that the department's employees engaged in reprisal discrimination?

II. Did the commission err by doubling the amount of Cannon's mental-anguish damages?

III. Is the department a proper party to a charge of discrimination brought before the commission?

IV. Did the commission err by not recusing itself from Cannon's case?

V. Did the commission evidence bias in its determination?

## ANALYSIS

On review of a contested-case hearing, this court may affirm the decision of the commission or remand it for further proceedings, or reverse or modify it

if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

 (a) in violation of constitutional provisions; or

 (b) in excess of the statutory authority . . .; or

 (c) made upon unlawful procedure; or

 (d) affected by other error of law; or

 (e) unsupported by substantial evidence in view of the entire record as submitted; or

 (f) arbitrary or capricious.

Minn.Stat. § 14.69 (2008); *see also* Minneapolis, Minn., Code of Ordinances § 141.60(b) (2010) (providing that judicial review of commission decisions is governed by the Minnesota Administrative Procedure Act).

## I.

■ The department challenges the commission's determination that it engaged in reprisal discrimination, arguing

---

**1.** Cannon does not challenge this determination on appeal.

that the record in its entirety does not contain substantial evidence to support the decision. Substantial evidence is defined as "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 464 (Minn.2002). "If [the commission] engage[d] in reasoned decisionmaking, the court will affirm, even though it may have reached a different conclusion had it been the factfinder." *Cable Commc'ns Bd. v. Nor-West Cable Commc'ns P'ship*, 356 N.W.2d 658, 669 (Minn.1984). "We defer to ... conclusions regarding conflicts in testimony, the weight given to expert testimony and the inferences to be drawn from testimony." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001).

The commission determined that the department engaged in reprisal discrimination based on the officers' actions after Cannon informed them that he would be filing a complaint. It is considered an unfair discriminatory practice

> [t]o engage in any reprisal, economic or otherwise, because another person opposed a discriminatory act forbidden under this title, has filed a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this title, or has associated with a person or group of persons of a different race, color, creed, religion, ancestry, national origin, sex, sexual orientation, status with regard to disability, age, marital status, status

with regard to public assistance or familial status.

Minneapolis, Minn., Code of Ordinances § 139.40(m)(3) (2010). "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment." Minneapolis, Minn., Code of Ordinances § 139.20 (2010).

■ We have not previously addressed the specific language of the Minneapolis ordinances at issue in this case. But when confronted with issues of statutory interpretation in other contexts, we have looked to the analysis of similarly worded statutes to aid in our construction. *See, e.g., Kolton v. County of Anoka*, 645 N.W.2d 403, 408, 410 (Minn.2002) (concluding that because the purposes and language of the Minnesota Human Rights Act (MHRA) and the federal Americans with Disabilities Act (ADA) are similar, analysis of the ADA can be used to construe the MHRA). Because the language in the Minneapolis ordinances mirrors that of the MHRA, *see* Minn.Stat. § 363A.15 (2008), we find it appropriate to draw from interpretations of the MHRA and related case law when considering the department's arguments.[2]

■ Claims of discrimination, including reprisal discrimination, are analyzed within the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Minneapolis Police Dep't v. Kelly*, 776 N.W.2d 760, 766 (Minn.App. 2010), *review denied* (Minn. Mar. 30, 2010) (relying on the *McDonnell Douglas* framework when reviewing a determination of discrimination by the Minneapolis Department of Civil Rights); *Minneapolis Police Dep't v. Minneapolis Comm'n on Civil Rights*, 402 N.W.2d 125, 132 (Minn.App.

---

**2.** The commission relied on cases involving the MHRA, as did both parties in their brief-

ing to this court.

1987) (utilizing the *McDonnell Douglas* framework to examine a claim of reprisal discrimination), *aff'd,* 425 N.W.2d 235 (Minn.1988). The *McDonnell Douglas* framework consists of "a prima facie case, an answer, and a rebuttal." *Minneapolis Police Dep't,* 402 N.W.2d at 130. The complainant must demonstrate a prima facie case of discrimination; the respondent must then proffer a non-discriminatory justification for its actions; and if the respondent succeeds, the complainant must then demonstrate that the proffered justification is a pretext for discrimination. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444–45 (Minn.1983). A complainant must establish the following three elements to demonstrate a prima facie case of reprisal discrimination: (1) the complainant engaged in statutorily protected conduct[3]; (2) adverse action was taken; and (3) a causal connection exists between the conduct and adverse action. *Id.* at 444. The department disputes all three elements of Cannon's prima facie case.

## A. Protected Conduct.

The department asserts that the record lacks substantial evidence to support the commission's determination that Cannon engaged in protected conduct. It is unlawful for a person providing public services[4] to discriminate on the basis of race. Minneapolis, Minn., Code of Ordinances § 139.40(j) (2010). It is also unlawful to engage in any reprisal "because another person opposed a discriminatory act forbidden under this title." Minneapolis, Minn., Code of Ordinances § 139.40(m)(3). The commission found that Cannon en-

gaged in a protected activity when he "opposed discriminatory conduct in good faith and with a reasonable belief," by stating in Officer Hagen's presence, "I think this is discrimination. I'm going to file a complaint."

■ The department contends that there is not substantial evidence to support the conclusion that Cannon was opposing discrimination when he made this statement. Discrimination may be demonstrated with proof of a difference in treatment of similarly situated individuals who are of a different race than the complainant or proof that the treatment of the complainant was "so at variance with what would reasonably be anticipated absent discrimination." *City of Minneapolis v. Richardson,* 307 Minn. 80, 87, 239 N.W.2d 197, 202 (1976). We have held that the protected-conduct prong of a reprisal discrimination claim is satisfied when a complainant "alleges facts supporting a good-faith, reasonable belief" that the conduct opposed constitutes a violation of the relevant legal provision. *Bahr v. Capella Univ.,* 765 N.W.2d 428, 436 (Minn.App.2009) (interpreting the reprisal-discrimination elements of the MHRA), *review granted* (Minn. Aug. 11, 2009). Thus, Cannon needed only a good-faith and reasonable belief that he was opposing discriminatory conduct at the time that he voiced his opposition in front of Officer Hagen.

■ We conclude that the record contains substantial evidence to support the commission's determination that Cannon had a good-faith and reasonable belief that Officer Hagen's conduct was discriminato-

---

**3.** In this case, we refer to this element of a reprisal claim as simply "protected conduct" and note that the conduct is protected by the Minneapolis ordinance, as opposed to the MHRA.

**4.** "Public services" is defined as "all activities, services or facilities offered to the public within the City of Minneapolis by any government agency or unit of government owned, operated or managed by any local, state or federal government." Minneapolis, Minn. Code of Ordinances § 139.20.

ry. Cannon testified that Officer Hagen walked into the small, quiet waiting room and, without introducing herself, began yelling at the individuals present without attempting to ascertain who had hit the plexiglass window. Cannon and his family testified that Officer Hagen swore, threatened everyone with arrest, and told them to "shut up." Cannon also introduced a statement of Ama Sabah, another individual who was at Wrecker's, indicating that Officer Hagen "spoke to [those waiting] like they were dogs."[5] Cannon and his family testified that they felt demeaned. Based on the calm atmosphere in the waiting room at the time the officers arrived, Cannon could have in good faith concluded that Officer Hagen's conduct was so at variance with what would reasonably be expected in those circumstances that discrimination was the only explanation.

■ The department's challenge to this finding is based primarily on the contrary testimony of the officers at the hearing. But the commission specifically credited the testimony of Cannon and his family and discredited much of the testimony of the two police officers. We will not disturb these credibility determinations on appeal. *See Blue Cross & Blue Shield of Minn.*, 624 N.W.2d at 278. We therefore conclude that the record contains substantial evidence to support the commission's finding that Cannon had a good-faith and reasonable belief that Officer Hagen's conduct was discriminatory in nature.

■ The department also argues that Cannon's statement, "This is discrimination," is too general to amount to protected conduct. A general voicing of issues and concerns does not constitute protected opposition to discrimination. *Carter v. Peace Officers Standards & Training Bd.*, 558 N.W.2d 267, 273 (Minn. App.1997) (holding that raising issues or concerns in letters to an employer did not constitute opposition to a practice forbidden under the MHRA). But we conclude that the language in the ordinance is sufficiently broad to encompass Cannon's statement. Section 139.40(m)(3) provides that a person "who oppose[s] a discriminatory act" cannot be subject to reprisal. The ordinance's language is broad and nonspecific, and we find nothing in this section imposing a requirement on a person to specify the ordinance being violated, what constitutes the discriminatory act being opposed, or to include anything specific in his or her statement of opposition. Because the ordinance's language is sufficiently broad, we conclude that it encompasses Cannon's act of voicing his intent to file a complaint for what he perceived to be discriminatory conduct on the part of Officer Hagen.

### B. Adverse Action.

■ The department asserts that the record lacks substantial evidence to demonstrate that the department took any adverse action against Cannon, arguing that

---

5. The department challenges the admission of these statements on appeal, but we conclude that this argument is without merit. The Minnesota Rules of Evidence do not apply in these hearings and rule 22 of the commission's Rules of Procedure for Contested Case Hearings states:

> The presiding commissioner may admit all evidence which possesses probative value, including hearsay, if it is the type of evidence on which reasonable, prudent persons are accustomed to rely in the conduct of their serious affairs.... Evidence which is incompetent, irrelevant, immaterial, or unduly repetitious shall be excluded.

*http://www.ci.minneapolis.mn.us/civil-rights/ commission/docs/Rules_for_contested_case_ hearings.pdf.* The statements of other witnesses are certainly relevant to the above proceeding and the fact that those statements constitute hearsay is of no consequence.

the conduct of the officers does not amount to adverse conduct. Reprisal is defined in the ordinance as "any form of intimidation, retaliation, or harassment." Minneapolis, Minn., Code of Ordinances § 139.20.

The record indicates three instances of adverse action on the part of the officers. First, after Cannon stated that he would be filing a complaint, Officer Hagen responded that Cannon could not do anything to her. This testimony was specifically credited by the commission; and a statement of this nature could certainly seem intimidating and harassing to an individual who had just voiced a desire to file a complaint against that person. Second, when Lois attempted to obtain Officer Hagen's badge number in order to file the complaint, Officer Hagen responded by yelling, "Yeah, you got my badge number! My badge number is 1019, got that?" Depending on the speaker's tone and volume, this conduct also amounts to both intimidation and harassment. And finally, when Cannon and his family attempted to leave Wrecker's, Officer Meath followed them into the parking lot and wrote down the license-plate number of their vehicle. The acts of following Cannon and his family outside and writing down their license-plate number could also be intimidating, as even Officer Meath conceded. We therefore conclude that the record contains substantial evidence to support the commission's conclusion that Officer Hagen and Officer Meath engaged in adverse actions following Cannon's statement that he was going to file a complaint.

**C. Causal Connection.**

 The department challenges the commission's conclusion that there was a causal connection between the officers' conduct and Cannon's opposition to discrimination. But based on the temporal proximity between Cannon's statement of opposition to the officers' conduct and the adverse conduct of the officers, we conclude that the record readily supports the commission's finding of a causal connection. We therefore conclude that the record contains substantial evidence to support the commission's determination that Cannon met his burden of demonstrating a prima facie case of reprisal discrimination.[6]

**II.**

The department challenges the damages and the civil penalty awarded by the commission, specifically arguing that the commission erred in doubling the amount of mental-anguish damages that it awarded Cannon. The department further argues that imposing a civil penalty on the Minneapolis Police Department is a moot point because, as a political subdivision of the City of Minneapolis, the city will essentially be putting money back into its own fund. We address each issue in turn.

**A. Did the commission err by doubling respondent's mental-anguish damages?**

 "The interpretation and application of a city ordinance is a question of law, which we review de novo." *Staeheli v. City of St. Paul*, 732 N.W.2d 298, 307 (Minn.App.2007). The rules governing

**6.** The department does not argue in its brief that the commission erred in its determination that relator's non-discriminatory reasons for the officers' actions were pretextual. In its reply brief, the department appears to raise this argument in the context of asserting that some of the commission's findings are clearly erroneous. We conclude that the factual findings of the commission are not clearly erroneous, as they are adequately supported by the Cannons' testimony. And to the extent that the department challenges the commission's determination that the department's justifications were pretextual, there is substantial evidence in the record to support that determination.

statutory interpretation are applicable to the interpretation of city ordinances. *Yeh v. County of Cass,* 696 N.W.2d 115, 128 (Minn.App.2005), *review denied* (Minn. Aug. 16, 2005). Therefore, when construing an ordinance, we first determine whether the language is reasonably subject to more than one interpretation. *See Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). If the language is unambiguous, we must give effect to the unambiguous text because the "letter of the law shall not be disregarded under the pretext of pursuing the spirit." *State v. Loge,* 608 N.W.2d 152, 155 (Minn. 2000) (quotation omitted).

The ordinance provides:

> In all cases, the hearing committee may order the respondent to pay an aggrieved party, who has suffered discrimination, compensatory damages in an amount up to three (3) times the actual damages sustained. In all cases, the hearing committee may also order the respondent to pay an aggrieved party, who has suffered discrimination, damages for mental anguish or suffering and reasonable attorneys fees in addition to punitive damages in an amount not more than eight thousand five hundred dollars ($8,500.00).

Minneapolis, Minn. Code of Ordinances § 141.50(m). The department argues that the language allowing treble damages does not apply to mental-anguish damages. We agree.

The ordinance permits a commission to award compensatory damages up to three times the amount of actual, sustained damages. In the next sentence, the ordinance authorizes a commission to award mental-anguish damages as well as other non-compensatory damages and attorney fees. Because the second sentence explicitly permits an award for mental-anguish damages, we conclude that mental-anguish damages are not contemplated in the preceding sentence that authorizes a compensatory-damages multiplier. And we will not add to this ordinance what was intentionally or inadvertently omitted. *See State v. Adickes,* 741 N.W.2d 904, 906 (Minn.App.2007).

In a case involving a nearly identical issue and a similar provision in the MHRA, we interpreted the statutory language to prohibit a multiplication of mental-anguish damages. In *Ray v. Miller Meester Adver., Inc.,* 664 N.W.2d 355 (Minn.App.2003), *aff'd,* 684 N.W.2d 404 (Minn.2004), we examined the damages-multiplier provision of the MHRA. While we acknowledged that "[a]pplication of the … multiplier is vested in the district court's discretion," we held that the language of the MHRA did "not include emotional damages within the damages permitted to be trebled." *Id.* at 369–70. As a result, we reversed the trebled emotional-damages award. *Id.* at 370.

We note that the commission's memorandum cites *Minneapolis Police Dep't* when defining compensatory damages. While we agree that the *Minneapolis Police Dep't* case stands for the proposition that, as a general matter, compensatory damages include emotional or mental-anguish damages, it did not address the issue before us and, instead, resolved an issue of damages for violations of civil rights. 402 N.W.2d at 132. We cannot ignore the plain language of the ordinance in favor of this unrelated case. We therefore conclude that the Minneapolis ordinance does not permit the commission to multiply an award for mental-anguish damages.

The commission found that Cannon suffered "past and future mental anguish as a result of the [department]'s discriminatory conduct." Based on the evidence presented by Cannon, the commission awarded Cannon $10,000 plus interest for past men-

tal suffering, and $5,000 for future mental suffering.[7] The commission then doubled the amount of damages. Because we conclude that the commission's decision to double Cannon's award for mental-anguish damages was error, we modify the judgment to $15,000.

■ The department further argues that the ordinance cap of $8,500 applies to mental-anguish damages, attorney fees, and punitive damages as a whole. But Cannon argues that the damages cap refers only to punitive damages and not to attorney fees or mental-anguish damages. Statutory construction rules require that a statute be given its plain and ordinary meaning, and when the words of the statute are ambiguous, "the intent of the legislature controls." *State v. Koenig*, 666 N.W.2d 366, 372 (Minn.2003). The language imposing a cap of $8,500 is ambiguous—it may be interpreted to apply to the three listed awards (mental-anguish damages, attorney fees, and punitive damages), and it also may be interpreted to apply only to an award of punitive damages.

When faced with an ambiguous ordinance, "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2008). And we must presume that the legislature intended the entire section to be "effective and certain," and not lead to an absurd result. Minn. Stat. § 645.17 (2008). In order to give effect to the language of the entire ordinance, we conclude that the $8,500 cap applies only to punitive damages. If the cap were applied to the total of all three awards, an individual could be precluded from recovering mental-anguish and punitive damages because the attorney fees in the case exceeded the $8,500 cap. Such an interpretation ignores the intent of the statute and leads to an absurd result. We therefore conclude that the $8,500 cap applies only to an award for punitive damages.

**B. Did the commission err by imposing a civil penalty of $7,500 on relator?**

■ The ordinance provides that if the commission finds that the respondent to a complaint engaged in discrimination, the commission shall order the imposition of a civil penalty to be paid into the general fund of the City of Minneapolis. Minneapolis, Minn., Code of Ordinances § 141.50(m). The amount of the penalty is determined by the commission based on "the seriousness and extent of the violation, the public harm occasioned by the violation, whether the violation was intentional, the cost of investigation incurred by the City of Minneapolis, and the financial resources of the respondent." *Id.*

The department challenges the commission's order to pay the City of Minneapolis a civil penalty of $7,500, on the ground that the penalty is moot because in essence, the City of Minneapolis is paying itself, as the department is a political subdivision of the city. We recently rejected this same argument. In *Kelly*, the Minneapolis Police Department challenged the imposition of a civil penalty, arguing that it was moot. 776 N.W.2d at 773. We concluded that the "ordinance plainly allows for civil penalties against all possible defendants, including public entities, and it explicitly addresses situations where the defendant is a 'political subdivision' of the city." *Id.* (quoting Minneapolis, Minn., Code of Ordinances § 141.50(m)). Because we found the language of the ordi-

---

7. The department does not challenge the base line award for mental-anguish damages, only the commission's use of the multiplier.

nance to be unambiguous, we upheld the civil penalty, noting that "[i]f the payment by [the Minneapolis Police Department] to the Minneapolis general fund is circular, the city can handle the issue internally." *Id.* at 773 n. 6. We conclude that *Kelly* is dispositive of relator's challenge to the civil penalty. Therefore, we affirm the imposition of a $7,500 civil penalty.

### III.

■ The department argues that the commission has no authority to enter judgment against it because it is not an independent entity subject to suit. Thus, the department asserts that all charges of discrimination must be brought against the City of Minneapolis, as opposed to the subdivision of the city that engaged in the allegedly discriminatory act. The department cites no authority that stands for this proposition, but relies on *Hyatt v. Anoka Police Dep't,* 700 N.W.2d 502 (Minn.App. 2005), *review denied* (Minn. Oct. 18, 2005), which held that a police department could not be subject to a civil lawsuit. Cannon has not brought a civil suit against the department. We note that the ordinance at issue here permits an individual to bring a charge of discrimination against the city or a political subdivision of the city. *See* Minneapolis, Minn., Code of Ordinances § 141.50(a) (2010) (allowing a charge of discrimination to be brought against a "person"); Minneapolis, Minn., Code of Ordinances § 139.20 (including "the City of Minneapolis or any department or unit thereof" in the definition of "person"). And the department has failed to demonstrate how *Hyatt* applies to a charge of discrimination filed with the commission. In addition, because the department raises this issue for the first time on appeal, we conclude that the department has waived this issue and decline to address whether the police department is a proper party to

a charge of discrimination. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988).

### IV.

■ The department contends that the commission erred by not recusing itself from Cannon's case. Although the commission's Rules of Procedure for Contested Case Hearings do not provide guidelines for removal, rule 14 provides that "[i]n ruling on motions where these rules are silent, the presiding commissioner shall apply the Rules of Civil Procedure for the District Court of Minnesota." And as noted by both parties, Minn. R. Civ. P. 63.02, states, in pertinent part: "No judge shall sit in any case if that judge is interested in its determination or if that judge might be excluded for bias from acting therein as a juror."

The department's motion for recusal was based on the fact that Cannon was a member of the commission from 1988 to 1998. The department's motion alleged no bias or interest of the specific panel members. And as noted by the commission, none of the panel members assigned to Cannon's case was a member of the commission before 2002. Because the department did not allege any facts that demonstrated an interest or bias by the panel, the commission did not abuse its discretion by denying the department's motion for removal. *See Minneapolis Police Dep't,* 425 N.W.2d at 241 (stating "the appointment of an independent hearing examiner ... lies within the discretion of the [commission]").

### V.

■ The department's final argument is that it was deprived of a fair hearing because the commission demonstrated bias during the proceedings. Hearings before the commission are to be conducted "in accordance with Chapter 14 of Minnesota Statutes." Minneapolis,

Minn., Code of Ordinances § 141.50(k)(1) (2010). Minn.Stat. § 14.50 (2008) requires that all hearings before an administrative-law judge be conducted in a fair and impartial manner; likewise, due process requires notice and an opportunity to be heard before a fair and impartial decision-maker, *State ex. rel Marlowe v. Fabian,* 755 N.W.2d 792, 794 (Minn.App.2008). But "[t]here is a presumption of administrative regularity, and the party claiming otherwise has the burden of proving a decision was reached improperly." *Buchwald v. Univ. of Minn.,* 573 N.W.2d 723, 727 (Minn.App.1998), *review denied* (Minn. Apr. 14, 1998).

In its supporting memorandum, the panel made the following comment:

Furthermore, when deciding the facts, panel members are instructed as follows, "Your best guide is your own good judgment, experience and common sense." Each of the panel members had experiences with Minneapolis Police Officers where the officers acted uncourteous, disrespectful, and impolite. It was agreed by the panel that the Minneapolis Police Department unfortunately has a bad reputation of treating the individuals they stop in a disrespectful manner. And as advocates for the City of Minneapolis, the panel wishes that the [department]'s culture would improve. Yet, two of the panel members are Caucasian and one is African American. Thus, we were unable to conclude based on our experience or by a preponderance of the evidence that the [department]'s mistreatment of [Cannon] was based on his race.

The department argues that this demonstrates the bias of the panel.

■ The panel members were specifically instructed to utilize their own experiences, judgment, and common sense when reaching a conclusion. The fact that the panel members did utilize their collective experience with the department when evaluating the evidence does not amount to error. Nothing in this record indicates that the panel relied solely on extra-record experiences, and in fact the record reflects that the panel carefully considered the evidence submitted by both parties. In its discussion of reprisal discrimination, the panel concluded that, by a preponderance of the evidence, Cannon proved a prima facie case of reprisal discrimination. Because the panel appropriately considered the evidence and made its determination on the correct grounds, we conclude that the department has not overcome the presumption of regularity in the proceeding.

## DECISION

Because the record contains substantial evidence to support the commission's determination that the department engaged in reprisal discrimination and because there is no support for the department's allegations of irregularity with respect to the commission or the panel, we affirm. But because we conclude that the language of the ordinance authorizing the commission to award up to three times the amount of compensatory damages does not extend to damages for mental anguish, we modify Cannon's judgment to reflect the original award of $15,000—$10,000 for past mental anguish and $5,000 for future mental anguish. We affirm the imposition of a $7,500 civil penalty and the commission's award of $22,283.09 for Cannon's attorney fees.

**Affirmed as modified.**