*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0792**

Michael Klockmann, et al.,
Relators,

vs.

Le Sueur County Board of Commissioners, et al.,
Respondent.

**Filed June 22, 2015
Affirmed
Hudson, Judge**

Le Sueur County Board of Commissioners

Gary G. Fuchs, Elizabeth E. Rein, Hammargren & Meyer, P.A., Bloomington, Minnesota (for relators)

Kenneth H. Bayliss, Quinlivan & Hughes, P.A., St. Cloud, Minnesota (for respondent Le Sueur County Board of Commissioners)

Timothy M. Kelley, Stinson Leonard Street, LLP, Minneapolis, Minnesota (for respondent Minnesota Municipal Power Agency)

Considered and decided by Hudson, Presiding Judge; Worke, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**HUDSON**, Judge

In this certiorari appeal from respondent-county's grant of a conditional use permit (CUP) for a silage-storage facility, relators, opposing landowners, argue that (a) the proposed use does not fall within the categories of conditional uses allowed by ordinance; (b) the county lacked authority to rescind its prior denial of the CUP and grant it on reconsideration; and (c) the grant of the CUP is not supported by the record evidence. We affirm.

**FACTS**

In June 2013, respondent Minnesota Municipal Power Agency (MMPA) filed an application for a CUP to construct a corn-silage storage facility in Sharon Township, Le Sueur County. The facility, which was intended to meet renewable-energy mandates, would contain storage bunkers holding numerous tons of silage for transport to a bioenergy facility located four miles away, in the City of Le Sueur. The bioenergy facility would then use an anaerobic digestion process to convert the agricultural processing waste into biogas for use in producing renewable electricity and pipeline-quality gas.

The storage-facility site was located in an agricultural zoning district. Relators Michael and Kimberly Klockmann own the residence closest to the site, about 1,000 feet to the north. The facility was designed to include 16 concrete, 175-foot-by-100-foot bunkers. Temporary covers would cover the bunkers after the silage was compacted; leakage and stormwater would be diverted to underground storage tanks. During peak

corn-pack season, two or three trucks per hour would operate on an 18-hour schedule; during the off-season, one to two trucks per hour would operate on an 8-12 hour schedule.

The storage-facility site had been moved from its initial proposed location in the City of Le Sueur because of a zoning issue near the airport. After the CUP application for the new site was submitted, the Le Sueur County Planning Commission delayed processing the application while the Minnesota Pollution Control Agency (MPCA) determined whether a new environmental assessment worksheet would be required; the MPCA later determined that a new environmental assessment worksheet was not required.

At a planning-commission meeting, neighboring landowners articulated several concerns, including possible flooding potential; health and odor problems caused by vermin; and noise and traffic-safety problems resulting from a high volume of truck traffic. An engineer representing MMPA testified that the site's topography was flat and far from surface waters, with no wetlands present and a clay layer of soil. He testified that the site design would capture the majority of stormwater runoff and that odor and vermin problems would be limited because many of the bunkers would be covered at one time. The planning commission recommended denial of the CUP, and respondent Le Sueur County Board of Commissioners (the county board) denied the CUP on a 5-0 vote in September 2013.

A month later, the landowners on whose property the facility would be located and MMPA as intervenor filed suit in district court. They sought a writ of mandamus

3

compelling the county board to grant the CUP and a judgment declaring that (1) the CUP had not been formally approved or denied within the required 60-day time limit of Minn. Stat. § 15.99 (2012) and (2) the proposed use required only a zoning permit, not a conditional-use permit. In November 2013, they also filed a certiorari appeal to this court, challenging the denial of the CUP as arbitrary and capricious or affected by legal error.

In April 2014, the county board reconsidered its denial of the CUP. MMPA had prepared screening, lighting, and drainage plans to address previous concerns. MMPA also agreed to install a 100-foot paved entrance, a well, and toilet facilities on the property, as well as to provide the county with copies of annual site reporting to the MPCA. An MMPA engineer indicated at a county board meeting that the facility's storage ponds are substantially higher than the county's drain tile system, so that overflow would occur into the county ditch only in an extraordinary event. He stated that noncontact stormwater would be allowed to percolate into the ground, but water that had been in contact with silage would be collected and brought to a leachate tank, which would be pumped out.

A number of landowners signed a petition requesting the county board to address, among other questions, "what use listed in the agricultural district allows silage and stockpiling in an agricultural district. . . . [I]f silage stockpiling is not listed as a permitted or conditional use, it is prohibited." At a public hearing, the county's attorney noted the pending court proceedings, and a landowner questioned whether those proceedings required reconsideration of the CUP. The attorney replied that the court actions were

4

unresolved and that if they were determined adversely to the county, the facility might be approved without conditions. The attorney also stated that governmental bodies had processes for reconsideration, that Robert's Rules of Order allowed a procedural motion to rescind the CUP, and that MMPA had indicated that it would seek dismissal of the lawsuits if the CUP were approved.

The neighboring landowners asserted the existence of a number of issues with the proposed facility. These included: (1) traffic safety with a high volume of trucking; (2) odor control; (3) adequate drainage for contact water in a former marsh area; (4) vermin control; (5) stormwater drainage; (6) declining values of nearby property; (7) lighting and noise issues; and (8) unfairness in locating the storage facility in the township when the bioenergy facility would instead serve the City of Le Sueur. Respondents' representatives indicated that odors would be minimized by covering the silage with high-density plastic material, the facility would abide by the local nuisance ordinance, and stormwater would be retained on site and percolate.

The county board voted 3-2 to approve the CUP with specific conditions, including monitoring the approved state disposal permit, constructing screening, complying with standards to minimize spillage, respecting highway weight limits and erecting safety signs on roads, implementing a drainage-and-lighting plan, providing a well and toilet facilities, and complying with the local nuisance ordinance. The district court case was dismissed with prejudice in May 2014, and by stipulation, this court dismissed the pending appeal of the county's previous decision denying the CUP. This

certiorari appeal follows.  This court granted MMPA's stipulated motion to intervene in the appeal.

# D E C I S I O N

A county board may approve a CUP if the applicant shows that all the standards and criteria in the county ordinance will be met.  Minn. Stat. § 394.301, subd. 1 (2014).  A county board's decision regarding a CUP is quasi-judicial and reviewable by writ of certiorari.  *Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 574 n.5 (Minn. 2000); *Picha v. Cnty. of McLeod*, 634 N.W.2d 739, 741 (Minn. App. 2001).  We independently review a county board's decision to grant a CUP to determine if it is unreasonable, arbitrary, or capricious.  *Schwardt v. Cnty. of Watonwan*, 656 N.W.2d 383, 386 (Minn. 2003).  First, we consider whether the reasons given by the governmental body are legally sufficient to allow the grant of the CUP.  *RDNT, LLC v. City of Bloomington*, 861 N.W.2d 71, 75–76 (Minn. 2015).  If the reasons given are legally sufficient, we examine whether they had a factual basis in the record.  *Id*. at 76.  This court "ha[s] traditionally held CUP approvals to a more deferential standard of review than CUP denials."  *Schwardt*, 656 N.W.2d at 389 n.4.  The interpretation of an existing ordinance presents a legal question, which this court reviews de novo.  *RDNT*, 861 N.W.2d at 75.

# I

Relators argue that the county board lacked authority to grant a CUP for construction of the silage-storage facility because that use is prohibited in an agricultural zoning district. Respondents argue that relators waived this argument by failing to raise it before the county board. The Minnesota Supreme Court has held that "[t]o allow parties to litigate an issue [of granting a CUP] on certiorari review that was not raised before the local zoning authority would encroach on the county's broad authority in making quasi-judicial decisions." *Big Lake Ass'n v. St. Louis Cnty. Planning Comm'n*, 761 N.W.2d 487, 491 (Minn. 2009). An appellate court

> review[s] the record to determine whether the issue was fairly raised for consideration by the zoning authority. The issue does not need to be framed in precise legal terms, but there must be sufficient specificity to provide fair notice of the nature of the challenge so that the zoning authority has an opportunity to consider and address the issue.

*Id*. "[G]eneralized complaints regarding the density of the proposal, which are often raised by local property owners," are not sufficient to raise a legal-classification issue. *Id*. at 492.

Here, the record shows that the landowners' petition to the county board raised the legal issue of whether silage stockpiling was listed as a permitted or conditional use in the Le Sueur County Zoning Ordinance. This argument is more than a "generalized complaint[]," and it supplied "fair notice of the nature of the challenge," so that the classification argument was not waived. *See id*.

7

Relators argue that the silage-storage facility does not fall within the listed categories permitted as conditional uses in an agricultural district under the zoning ordinance. We review de novo the county's interpretation of its ordinance, applying the same rules that govern statutory interpretation. *Eagle Lake of Becker Cnty. Lake Ass'n v. Becker Cnty. Bd. of Comm'rs*, 738 N.W.2d 788, 792 (Minn. App. 2007). "[W]hen construing an ordinance, we first determine whether the language is reasonably subject to more than one interpretation." *Cannon v. Minneapolis Police Dep't*, 783 N.W.2d 182, 193 (Minn. App. 2010). "If the language is unambiguous, we must give effect to the unambiguous text because the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.* (quotation omitted). Sections of an ordinance must be read together to determine their plain meaning. *Stotts v. Wright Cnty.*, 478 N.W.2d 802, 805 (Minn. App. 1991), *review denied* (Minn. Feb. 11, 1992). If the language is ambiguous, we use canons of statutory interpretation to discern legislative intent. *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013).

Relators maintain that the ordinance's failure to specify a silage-storage structure as a conditional use in an agricultural zoning district shows an intent to prohibit such a facility in that district. *See* Le Sueur County, Minn. Zoning Ordinance, § 5, subd. 5 (2013) (stating that "[w]henever in any Zoning District a use is neither specifically permitted or [a] conditional use, the use shall be considered prohibited"). They argue that the proposed facility is more properly characterized as a conditional use for outdoor and open storage in a General Business District, *see id.* at § 10, subd. 3(C), or as a facility for storage of materials in a General Industrial District. *See id.* at § 11, subd. 3(A). They

8

argue that, therefore, the county board should have ordered a study to decide in which zoning district the facility would have been an acceptable use. *See id*. at § 5, subd. 5 (stating that if a use is unlisted, the county board may either amend the ordinance to provide for it, find that it is not compatible in that zoning district, or "conduct a study to determine if the use is acceptable and, if so, what Zoning District would be most appropriate").

We conclude, however, that, read as a whole, the ordinance allows the proposed facility to be considered as a conditional use in an agricultural district. The ordinance lists the following as conditional uses in that district:

> Water supply tanks or buildings, reservoirs, commercial wells, gas regulator stations, electric substations or transmission lines greater [tha]n 35kV, railroad right-of-way, but *not including* railroad yards, public sewage treatment facilities and other *similar* essential public utility and service structures.

*Id*., § 8, subd. 3(J) (emphasis added). "Essential services" are defined to include "collection, communication, supply or disposal systems and structures, used by public utilities or governmental departments or commissions. *Id*., § 4. The silage-storage facility is a "collection [or] supply . . . structure[]." And MMPA falls within the category of public utilities, which are defined under the ordinance as "[p]ersons, corporations, or governments, supplying gas, electric, transportation, water, sewer, or land line telephone service to the general public." *Id*. Because the silage-storage facility is a "collection [or]

9

supply . . . structure[] . . . used by a public utility," the facility qualifies as an "essential service" structure under the ordinance. *See id*. § 4; § 8, subd. 3(J).[1]

By its terms, the ordinance excludes as conditional uses "essential public utility and service structures" if those structures are "similar" to "railroad yards" and "public sewage treatment facilities." *Id*., § 8, subd. 3(J). "Similar" has been defined as "[r]elated in appearance or nature; alike though not identical." *American Heritage Dictionary of the English Language* 1682 (3d ed. 1992). We conclude that the proposed silage storage facility does not fall within the ordinance's exclusions from the list of conditional uses because, although it is an "essential public utility and service structure," it is not "similar" to the listed prohibited uses of railroad yards and public sewage treatment facilities. Le Sueur County Zoning Ordinance, § 8, subd. 3(J). This reasoning is also consistent with an additional provision in the ordinance, which expressly allows as a conditional use the similar energy-related use of commercial wind energy conversion systems. *Id*., § 8, subd. 3(Y). Therefore, the county board had authority to grant a CUP for the construction of the silage-storage facility.

## II

Relators also argue that the county board lacked authority to modify its earlier denial of the CUP. Respondents maintain that relators waived this argument as well, by

---

[1] We note relators' argument involving another clause of the ordinance, which defines "essential services" to include additional items "not including structures" that are "required for protection of the public health, safety or general welfare." *See* Le Sueur County, Minn. Zoning Ordinance, § 4. Relators maintain that because the facility is a structure, it does not fall within that definition. But because we have concluded that the facility qualifies as an essential service structure under a different definition, we need not address this argument.

failing to raise it before the county board. *See Big Lake*, 761 N.W.2d at 492. But the record reflects that, at a public hearing, landowners questioned the county's authority to reconsider a previously denied CUP, and the county's attorney had an opportunity to respond to that argument. Thus, we conclude that relators adequately raised this issue, and we decline to consider it waived. *See Big Lake*, 761 N.W.2d at 491 (requiring that the county receive "fair notice" of a challenged issue so that it could respond to legal arguments).

Relators argue that the relevant zoning ordinance precludes the county board from reconsidering its denial of a CUP within one year after its original decision. That ordinance provides, relating to CUPs:

> SUBDIVISION 4. RECONSIDERATION
>
> Whenever an application for a [CUP] has been considered and denied by the Board of County Commissioners, a similar application for a [CUP] affecting the same property shall not be considered again by the Planning Commission or Board of County Commissioners for at least one (1) year from the date of its denial.

Le Sueur County Zoning Ordinance, § 21, subd. 4.

The plain language of subdivision four prohibits reconsideration of "a similar" application for a CUP within a one-year period. *Id*. But "a similar" application is not, by definition, "the same" application. *See American Heritage Dictionary of the English Language* 1682 (stating definition of "similar"). Here, respondents did not submit a different, but similar, application within one year. They never withdrew their initial application, but simply re-argued for its approval on the merits.

11

Further, the county board reconsidered the application following a timely challenge to its original decision denying the CUP. This court has recognized the principle that "an administrative agency has a well-established right to reopen, rehear, and redetermine [a] matter even after a determination has been made." *In re N. Metro Harness*, 711 N.W.2d 129, 135–36 (Minn. App. 2006) (quotation omitted), *review denied* (Minn. June 20, 2006). In *N. Metro Harness*, we held that the Minnesota Racing Commission could reconsider an application for a Class A racetrack license after receiving new relevant information, concluding that the commission had inherent authority to reconsider the application when it acted with diligence. *Id*. at 132, 136.

The principle of an agency's inherent authority to reconsider its prior decision is particularly applicable here, where the county board reconsidered its decision following a timely petition for certiorari review of the initial CUP denial. The county board was not precluded from reconsidering its decision on the CUP when an appeal from that decision was pending. *See id*. at 136–37; *cf. Little v. Arrowhead Regional Corrections*, 773 N.W.2d 344, 346 (Minn. App. 2009) (noting that a pending postdecision motion provides an appropriate basis for deferring appellate review so that the original decision-maker may address the motion). Under these circumstances, we conclude that the ordinance's time limitations for reconsideration do not apply, and the county board was not precluded from reconsidering its initial denial of respondents' application for a CUP within a one-year period.

## III

Relators argue that, even if the county board had authority to reconsider its denial of the CUP, its action in granting the CUP was unsupported by the facts on record. We examine whether the county board "acted unreasonably, arbitrarily, or capriciously" in its decision regarding the CUP. *Schwardt*, 656 N.W.2d at 386. Our "function is not to weigh the evidence, but to review the record to determine whether there was legal evidence to support the zoning authority's decision." *RDNT*, 861 N.W.2d at 76 (quotation omitted). On conflicting evidence, this court generally defers to the judgment of the zoning authority. *Id*.

The county board granted the CUP on reconsideration with designated conditions that included: monitoring the approved state disposal permit, constructing screening, minimizing spillage, respecting highway weight limits and erecting safety signs, maintaining standards under a drainage-and-lighting plan, providing a well and toilet facilities, and complying with the local nuisance ordinance. Relators argue that, even with these conditions, the CUP did not address additional concerns of road safety, odor, groundwater contamination, lighting, and wildlife control. A county board may consider neighborhood opposition to granting a CUP only if it rests on concrete information. *Bartheld v. Cnty. of Koochiching*, 716 N.W.2d 406, 413 (Minn. App. 2006). Relators maintain that their concerns relate to the ordinance Land Use Performance Standards, including those addressing water pollution, odors, access drives, and screening. *See generally* Le Sueur County Zoning Ordinance, § 19, subd. 3. But the CUP required compliance with a number of these standards, including specific compliance with the

13

MPCA disposal permit and engineering standards recommended by the Minnesota Department of Transportation. And the lighting plan provided for directional lighting to alleviate lighting concerns for adjacent properties. Under these circumstances, the plan's failure to provide additional, site-specific solutions for the landowners' additional concerns does not render the decision to approve the CUP unreasonable, arbitrary, or capricious, and legal evidence sufficiently supports the county board's approval of the CUP.

**Affirmed.**